# UNITED STATES DEPARTMENT OF STATE *v.* RAY ET AL.

No. 90–747.   Argued October 9, 1991—Decided December 16, 1991

STEVENS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, BLACKMUN, O'CONNOR, and SOUTER, JJ., joined, and in all but Part III of which SCALIA and KENNEDY, JJ., joined. SCALIA, J., filed an opinion concurring in part and concurring in the judgment, in

which KENNEDY, J., joined, *post*, p. 179. THOMAS, J., took no part in the consideration or decision of the case.

*Kent L. Jones* argued the cause for petitioner. With him on the briefs were *Solicitor General Starr, Assistant Attorney General Gerson, Deputy Solicitor General Roberts, Leonard Schaitman,* and *Bruce G. Forrest.*

*Michael Dean Ray, pro se,* argued the cause for respondents. With him on the brief were *Neil Dwight Kolner* and *Eric J. Sinrod.**

JUSTICE STEVENS delivered the opinion of the Court.

In response to a Freedom of Information Act (FOIA) request, the Department of State produced 25 documents containing information about Haitian nationals who had attempted to immigrate illegally to the United States and were involuntarily returned to Haiti. Names of individual Haitians had been deleted from 17 of the documents. The question presented is whether these deletions were authorized by FOIA Exemption 6, which provides that FOIA disclosure requirements do not apply to "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U. S. C. § 552(b)(6).

I

Haiti is a densely populated nation located about 500 nautical miles southeast of Florida on the western third of the Caribbean Island of Hispaniola. Prior to 1981, its history of severe economic depression and dictatorial government

---

*Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *Debra A. Valentine, David L. Sobel, John A. Powell, Lucas Guttentag,* and *Gary M. Stern;* for the American Newspaper Publishers Association et al. by *Robert C. Bernius, René P. Milam, Barbara Wartelle Wall, Jane E. Kirtley, Richard M. Schmidt, Bruce W. Sanford, James E. Grossberg,* and *George Freeman;* and for the Lawyers Committee for Human Rights et al. by *David C. Vladeck* and *Alan B. Morrison.*

motivated large numbers of its citizens to emigrate to Florida without obtaining the permission of either the Haitian Government or the Government of the United States. A small number of those undocumented aliens were eligible for asylum as political refugees,[1] but almost all of them were subject to deportation if identified and apprehended.

In response to this burgeoning "illegal migration by sea of large numbers of undocumented aliens" from Haiti and other countries, President Reagan ordered the Coast Guard and the Secretary of State to intercept vessels carrying undocumented aliens and, except for passengers who qualified for refugee status, to return them to their point of origin. See Presidential Proclamation No. 4865, 3 CFR 50 (1981 Comp.); Exec. Order No. 12324, 3 CFR 180 (1981 Comp.). The President also directed the Secretary of State to enter into "cooperative arrangements with appropriate foreign governments for the purpose of preventing illegal migration to the United States by sea." *Ibid.* Following this directive, the Secretary of State obtained an assurance from the Haitian Government that interdicted Haitians would "not be subject to

---

[1] Article 1.2 of the United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, 606 U. N. T. S. 268, to which the United States acceded in 1968, 19 U. S. T. 6223, 6261, T. I. A. S. No. 6577, defines a "refugee" as a person absent from his or her country due to a "well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion." The Protocol obligates the United States to comply with the substantive requirements of Articles 2 through 34 of the United Nations Convention Relating to the Status of Refugees, July 28, 1951, 189 U. N. T. S. 150. 19 U. S. T., at 6225. Article 33.1 of the Convention, 19 U. S. T., at 6267, states: "No Contracting State shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." See generally *INS* v. *Stevic*, 467 U. S. 407, 416–418 (1984). Article 34, 19 U. S. T., at 6267, provides that "Contracting States shall as far as possible facilitate the assimilation and naturalization of refugees. . . ." See generally *INS* v. *Cardoza-Fonseca*, 480 U. S. 421, 436–441 (1987).

prosecution for illegal departure." See Agreement on Migrants—Interdiction, Sept. 23, 1981, United States-Haiti, 33 U. S. T. 3559, 3560, T. I. A. S. No. 10241. In order to monitor compliance with that assurance, State Department personnel conducted confidential interviews with a "representative sample" of unsuccessful emigrants about six months after their involuntary return. All but one or two of the emigrants reported that they had not been harassed or prosecuted since their return to Haiti.

Respondents in this case are a Florida lawyer who represents undocumented Haitian nationals seeking political asylum in the United States and three of his clients. In immigration proceedings, respondents are attempting to prove that Haitians who immigrated illegally will face a well-founded fear of persecution if they return to their homeland and therefore are refugees entitled to asylum in this country. Relying in part on the evidence in the reports of the interviews with former passengers on vessels interdicted by the Coast Guard, the Government has taken the position in those proceedings that respondents' fear of persecution is not well founded.

In order to test the accuracy of the Government's assertion that undocumented Haitian nationals have not been persecuted upon their return to Haiti, respondents made a series of FOIA requests to three Government agencies for copies of reports of the interviews by State Department personnel with persons who had been involuntarily returned to Haiti. Insofar as relevant to the question before us, the net result of these requests was the production by the State Department of 25 documents, containing approximately 96 pages, which describe a number of interviews with specific returnees and summarize the information that had been obtained during successive periods.[2] Thus, for example, a summary

---

[2] Respondents also sought disclosure of an alleged list of 600 Haitians who had been returned to Haiti and had not been mistreated after their arrival. The District Court found, however, that the "record fails to dis-

prepared in March 1985 reported that since the followup program had begun 3½ years earlier, United States embassy officials in Haiti had interviewed 812 returnees, 22.83 percent of the total migrant interdictee population.[3] During that time, the report continued, "only two interdictees have mentioned a threat or mistreatment by the authorities. In one case the claim was unverifiable as there were no witnesses present, in the second case higher authorities intervened to prevent mistreatment by a rural policeman."[4] In 17 of the documents, the information related to individual interviews, but the names and other identifying information had been redacted before the documents were delivered to respondents.[5] The only issue for us to decide is whether that redaction was lawful.

---

close that any documents have been improperly withheld o[r] that they, indeed, exist," *Ray* v. *United States Department of Justice*, 725 F. Supp. 502, 504 (SD Fla. 1989), and the Eleventh Circuit affirmed this finding, *Ray* v. *United States Department of Justice*, 908 F. 2d 1549, 1559–1560 (1990). We have no reason to question this finding and, therefore, we are concerned only with the 25 documents containing summaries of interviews with illegal Haitian immigrants who were involuntarily returned to Haiti.

[3] Plaintiffs' Notice of Filing Defendant State Department's Edited Documents 12.

[4] The May 1985 report, the last report in the record, states that as of that date, embassy officials had interviewed 1,052 of the returnees, 23.28 percent of the total migrant returnee population. *Id.*, at 96. The report concluded that the interviews provide "further evidence" that Haiti "is keeping its commitment under the 1981 Migrant Interdiction Agreement not to prosecute or harass returned migrants for their illegal departure," but noted that "the embassy will continue its follow-up program with the goal of reaching a 25-percent interview rate of returned migrants." *Ibid.*

[5] For example, one memorandum relates the following:

"_____ is an unemployed 21-year-old living with his mother and five younger siblings in a one-room shack in Delmas. His older brother, who is employed and living in Port-au-Prince, had paid the $100 fare for _____ to travel on the S/V Sainte Marie, interdicted enroute to Miami on 6/13/83.

"_____ explained that he had wanted to live in Miami, although he has no family there. He never went to school and has no marketable skills. _____ says that he is thinking of another attempt to reach the

The District Court found that any invasion of privacy from the "mere act of disclosure of names and addresses would be de minimis and little more than speculation" and was clearly outweighed by the public interest in the "safe relocation of returned Haitians." *Ray* v. *United States Department of Justice*, 725 F. Supp. 502, 505 (SD Fla. 1989). It therefore ordered the Department to produce the redacted information.

The Court of Appeals affirmed. *Ray* v. *United States Department of Justice*, 908 F. 2d 1549 (CA11 1990). For two reasons, however, it disagreed with the District Court's "de minimis" characterization of the privacy interest at stake. First, it noted that respondents wanted the redacted information in order to enable them to contact the interviewees directly and to question them about their treatment by the Haitian Government. *Id.*, at 1554. Second, the Court recognized that "the returnees were promised confidentiality before they talked with U. S. government officials." *Ibid.* Thus, the Court of Appeals began its balancing process "by acknowledging that there are significant privacy interests at stake." *Ibid.* It nevertheless concluded that those interests were outweighed by the public interest in learning whether the Government is "adequately monitoring Haiti's compliance with its obligation not to persecute returnees" and "is honest to the public" when its officials express the opinion that Haiti is adhering to that obligation. *Id.*, at 1555. The court recognized that the redacted information would not, in and of itself, tell respondents anything about

States. He cannot find a job here and said that he would like to travel. The twelve days spent on board the S/V Sainte Marie were difficult, he admitted, but he is willing to take another chance. _____ emphatically said that he had had no problems from Haitian officials since his return. He has been assisted twice by the Red Cross with food and money grants totalling $50." Attachment 2 to Declaration of John Eaves, Acting Deputy Director of the Office of Mandatory Review of the Classification and Declassification Center of the Department of State 5.

Haiti's treatment of the returnees or this Government's honesty, but it concluded that the indirect benefit of giving respondents the means to locate the Haitian returnees and to cross-examine them provided a public value that required disclosure. *Id.*, at 1555–1556.

We granted certiorari to review the Court of Appeals' construction of Exemption 6, 499 U. S. 904 (1991), and now reverse.

## II

It is appropriate to preface our evaluation of the narrow question that we must decide with an identification of certain matters that have been resolved in earlier stages of the litigation.

After the District Court's initial decision, the State Department filed additional affidavits in support of a claim that the redacted information was protected from disclosure by Exemption 1, the exemption for classified documents, and also by Exemption 7(C), the exemption for law enforcement records which, if released, "could reasonably be expected to constitute an unwarranted invasion of personal privacy."[6] The District Court ruled that the Government had waived those claims by not raising them until after its Exemption 6 claim had been denied, 725 F. Supp., at 505, and the Court of Appeals held that that ruling was not an abuse of discretion,

---

[6] The relevant portions of Exemptions 1, 6, and 7 read as follows:

"(b) [The FOIA disclosure] section does not apply to matters that are—

"(1)(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order;

.        .        .        .        .

"(6) personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

"(7) records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy . . . ." 5 U. S. C. § 552.

908 F. 2d, at 1557. We denied the Government's certiorari petition insofar as it sought review of that question, but mention it here because the Government's burden in establishing the requisite invasion of privacy to support an Exemption 6 claim is heavier than the standard applicable to Exemption 7(C). See *Department of Justice* v. *Reporters Comm. for Freedom of Press,* 489 U. S. 749, 756 (1989). To prevail in this case under Exemption 6, the Government must establish that the invasion of the interviewees' privacy would be "clearly unwarranted."

In attempting to meet its burden, the Government relies, in part, on the fact that the interviews with the Haitian returnees were conducted pursuant to assurances of confidentiality. In this Court, respondents have suggested that the texts of some of the reported interviews do not expressly mention such assurances. Neither the District Court nor the Court of Appeals, however, questioned the fact that promises of confidentiality had actually been made; on the contrary, after finding that such assurances had been made, both courts concluded as a matter of law that they did not outweigh the public interest in disclosure.[7] Insofar as the promises of confidentiality are relevant, we of course accept the factual predicate for the Court of Appeals decision.

That court's conclusion rested, in part, on what it described as the public interest in learning "whether our government is honest to the public about Haiti's treatment of returnees." 908 F. 2d, at 1555. The Court of Appeals did not, however, suggest that there was any evidence in the

---

[7] Thus, the Court of Appeals explained:

"We are also mindful, as the government points out, that the returnees were promised confidentiality before they talked with U. S. government officials. That, of course, is a factor that adds weight to the privacy interests at stake here, but it is not a factor that compels us to prohibit disclosure in this case." 908 F. 2d, at 1554; see also 725 F. Supp., at 505 ("The promise of confidentiality by the State Dept. is only one factor to be considered and, in this case, is not determinative of the outcome").

State Department records that was inconsistent with any public statement made by Government officials, or that there was any other factual basis for questioning the honesty of its officials. Thus, as with the assurances of confidentiality, we have no occasion to question the Government's version of the relevant facts.

We note, finally, that respondents have never questioned the Government's position that the documents at issue consist of "personnel and medical files and similar files" within the meaning of Exemption 6.[8] Because the 17 reports from which identifying information was deleted unquestionably apply to the particular individuals who had been returned and interviewed, they are "similar files" within the meaning of the exemption. See *Department of State* v. *Washington Post Co.*, 456 U. S. 595, 602 (1982). The only question, therefore, is whether the disclosure of the unredacted interview reports "would constitute a clearly unwarranted invasion of that person's privacy."

### III

The Freedom of Information Act was enacted to facilitate public access to Government documents. *John Doe Agency* v. *John Doe Corp.*, 493 U. S. 146, 151 (1989). The statute was designed "'to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny.'" *Department of Air Force* v. *Rose*, 425 U. S. 352, 361 (1976). Consistently with this purpose, as well as the plain language of the Act, the strong presumption in favor of disclosure places the burden on the agency to justify the withholding of any requested documents. *Ibid.; Department of Justice* v. *Reporters Comm.*, 489 U. S., at 755. That burden remains with the agency when it seeks to justify the redaction of identifying information in a particular document as well as when it seeks to withhold an entire document. See 5 U. S. C. § 552(a)(4)(B).

---

[8] See n. 6, *supra.*

The redaction procedure is, however, expressly authorized by FOIA.[9]  Congress thus recognized that the policy of informing the public about the operation of its Government can be adequately served in some cases without unnecessarily compromising individual interests in privacy.[10]  Accordingly,

---

[9] As we noted in *Department of Justice* v. *Reporters Comm. for Freedom of Press,* 489 U. S. 749, 755, n. 7 (1989):

"Congress employed . . . language [similar to that contained in Exemption 6] earlier in the statute to authorize an agency to delete identifying details that might otherwise offend an individual's privacy:

"'To the extent required to prevent a clearly unwarranted invasion of personal privacy, an agency may delete identifying details when it makes available or publishes an opinion, statement of policy, interpretation, or staff manual or instruction.' §552(a)(2)."

In addition, Congress mandated that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt . . . ." 5 U. S. C. §552(b).

[10] See S. Rep. No. 813, 89th Cong., 1st Sess., 7 (1965) ("The authority to delete identifying details after written justification is necessary in order to be able to balance the public's right to know with the private citizen's right to be secure in his personal affairs which have no bearing or effect on the general public.  For example, it may be pertinent to know that unseasonably harsh weather has caused an increase in public relief costs; but it is not necessary that the identity of any person so affected be made public"); H. R. Rep. No. 1497, 89th Cong., 2d Sess., 8 (1966) ("The public has a need to know, for example, the details of an agency opinion or statement of policy on an income tax matter, but there is no need to identify the individuals involved in a tax matter if the identification has no bearing or effect on the general public").  These examples guided our analysis in *Department of Justice* v. *Reporters Comm., supra,* in which we held that criminal identification records, or "rap sheets," were law enforcement records which, if released, "could reasonably be expected to constitute an unwarranted invasion of personal privacy" and therefore were exempt from disclosure under Exemption 7.  We explained that:

"Both public relief and income tax assessments—like law enforcement— are proper subjects of public concern.  But just as the identity of the individuals given public relief or involved in tax matters is irrelevant to the public's understanding of the Government's operation, so too is the identity of individuals who are the subjects of rap sheets irrelevant to the public's understanding of the system of law enforcement.  For rap sheets

in the leading case interpreting Exemption 6, we held that the statute required disclosure of summaries of Air Force Academy disciplinary proceedings "with personal references or other identifying information deleted." *Rose*, 425 U. S., at 380. The question in this case is whether petitioner has discharged its burden of demonstrating that the disclosure of the contents of the interviews with the Haitian returnees adequately served the statutory purpose and that the release of the information identifying the particular interviewees would constitute a clearly unwarranted invasion of their privacy.

As we held in *Rose*, the text of the exemption requires the Court to balance "the individual's right of privacy" against the basic policy of opening "agency action to the light of public scrutiny," *id.*, at 372. The District Court and the Court of Appeals properly began their analysis by considering the significance of the privacy interest at stake. We are persuaded, however, that several factors, when considered together, make the privacy interest more substantial than the Court of Appeals recognized.

First, the Court of Appeals appeared to assume that respondents sought only the names and addresses of the interviewees. But respondents sought—and the District Court ordered that the Government disclose—the unredacted interview summaries. As the Government points out, many of these summaries contain personal details about particular interviewees.[11] Thus, if the summaries are released without the names redacted, highly personal information regarding marital and employment status, children, living conditions, and attempts to enter the United States would be linked

---

reveal only the dry, chronological, personal history of individuals who have had brushes with the law, and tell us nothing about matters of substantive law enforcement policy that are properly the subject of public concern." *Id.*, at 766, n. 18.

[11] See n. 5, *supra.*

publicly with particular, named individuals. Although disclosure of such personal information constitutes only a *de minimis* invasion of privacy when the identities of the interviewees are unknown, the invasion of privacy becomes significant when the personal information is linked to particular interviewees. Cf. *id.*, at 380–381.

In addition, disclosure of the unredacted interview summaries would publicly identify the interviewees as people who cooperated with a State Department investigation of the Haitian Government's compliance with its promise to the United States Government not to prosecute the returnees. The Court of Appeals failed to acknowledge the significance of this fact.[12] As the State Department explains, disclosure of the interviewees' identities could subject them or their families to "embarrassment in their social and community relationships." App. 43. More importantly, this group of interviewees occupies a special status: They left their homeland in violation of Haitian law and are protected from prosecution by their government's assurance to the State Department. Although the Department's monitoring program indicates that that assurance has been fulfilled, it nevertheless remains true that the State Department considered the danger of mistreatment sufficiently real to necessitate that monitoring program. How significant the danger of mistreatment may now be is, of course, impossible to measure,

---

[12] We emphasize, however, that we are not implying that disclosure of a list of names and other identifying information is inherently and always a significant threat to the privacy of the individuals on the list. Instead, we agree with the Court of Appeals for the District of Columbia Circuit that whether disclosure of a list of names is a "'significant or a *de minimis* threat depends upon the characteristic(s) revealed by virtue of being on the particular list, and the consequences likely to ensue.'" *National Assn. of Retired Federal Employees* v. *Horner*, 279 U. S. App. D. C. 27, 31, 879 F. 2d 873, 877 (1989), cert. denied, 494 U. S. 1078 (1990). As discussed *infra*, disclosure of the interviewees' names would be a significant invasion of their privacy because it would subject them to possible embarrassment and retaliatory action.

but the privacy interest in protecting these individuals from any retaliatory action that might result from a renewed interest in their aborted attempts to emigrate must be given great weight. Indeed, the very purpose of respondents' FOIA request is to attempt to prove that such a danger is present today.

We are also persuaded that the Court of Appeals gave insufficient weight to the fact that the interviews had been conducted pursuant to an assurance of confidentiality. We agree that such a promise does not necessarily prohibit disclosure, but it has a special significance in this case. Not only is it apparent that an interviewee who had been given such an assurance might have been willing to discuss private matters that he or she would not otherwise expose to the public—and therefore would regard a subsequent interview by a third party armed with that information as a special affront to his or her privacy—but, as discussed above, it is also true that the risk of mistreatment gives this group of interviewees an additional interest in assuring that their anonymity is maintained.

Finally, we cannot overlook the fact that respondents plan to make direct contact with the individual Haitian returnees identified in the reports. As the Court of Appeals properly recognized, the intent to interview the returnees magnifies the importance of maintaining the confidentiality of their identities.

## IV

Although the interest in protecting the privacy of the redacted information is substantial, we must still consider the importance of the public interest in its disclosure. For unless the invasion of privacy is "clearly unwarranted," the public interest in disclosure must prevail. As we have repeatedly recognized, FOIA's "basic policy of 'full agency disclosure unless information is exempted under clearly delineated statutory language,' . . . focuses on the citizens' right to be informed about 'what their government is up to.' Official

information that sheds light on an agency's performance of its statutory duties falls squarely within that statutory purpose." *Department of Justice* v. *Reporters Comm.*, 489 U. S., at 773 (quoting *Department of Air Force* v. *Rose*, 425 U. S., at 360–361) (internal citations omitted). Thus, the Court of Appeals properly recognized that the public interest in knowing whether the State Department has adequately monitored Haiti's compliance with its promise not to prosecute returnees is cognizable under FOIA. We are persuaded, however, that this public interest has been adequately served by disclosure of the redacted interview summaries and that disclosure of the unredacted documents would therefore constitute a clearly unwarranted invasion of the interviewees' privacy.

The unredacted portions of the documents that have already been released to respondents inform the reader about the State Department's performance of its duty to monitor Haitian compliance with the promise not to prosecute the returnees. The documents reveal how many returnees were interviewed, when the interviews took place, the contents of individual interviews, and details about the status of the interviewees. The addition of the redacted identifying information would not shed any additional light on the Government's conduct of its obligation.

The asserted public interest on which respondents rely stems not from the disclosure of the redacted information itself, but rather from the hope that respondents, or others, may be able to use that information to obtain additional information outside the Government files. The Government argues that such "derivative use" of requested documents is entirely beyond the purpose of the statute and that we should adopt a categorical rule entirely excluding the interest in such use from the process of balancing the public interest in disclosure against the interest in privacy. There is no need to adopt such a rigid rule to decide this case, however,

because there is nothing in the record to suggest that a second series of interviews with the already-interviewed returnees would produce any relevant information that is not set forth in the documents that have already been produced. Mere speculation about hypothetical public benefits cannot outweigh a demonstrably significant invasion of privacy. Accordingly, we need not address the question whether a "derivative use" theory would ever justify release of information about private individuals.

We are also unmoved by respondents' asserted interest in ascertaining the veracity of the interview reports. There is not a scintilla of evidence, either in the documents themselves or elsewhere in the record, that tends to impugn the integrity of the reports. We generally accord Government records and official conduct a presumption of legitimacy. If a totally unsupported suggestion that the interest in finding out whether Government agents have been telling the truth justified disclosure of private materials, Government agencies would have no defense against requests for production of private information. What sort of evidence of official misconduct might be sufficient to identify a genuine public interest in disclosure is a matter that we need not address in this case. On the record before us, we are satisfied that the proposed invasion of the serious privacy interest of the Haitian returnees is "clearly unwarranted."

The judgment of the Court of Appeals is

*Reversed.*

JUSTICE THOMAS took no part in the consideration or decision of this case.

JUSTICE SCALIA, with whom JUSTICE KENNEDY joins, concurring in part and concurring in the judgment.

I join the Court's judgment and its opinion except Part III.

Exemption 6 of the Freedom of Information Act (FOIA) provides that the Act's disclosure requirements do not apply to "personnel and medical files and similar files the disclosure

of which would constitute a clearly unwarranted invasion of personal privacy." 5 U. S. C. § 552(b)(6). As the Court recognizes, *ante*, at 175, this requires an agency to balance the interest in personal privacy against the public interest in disclosure. *Department of Air Force* v. *Rose*, 425 U. S. 352, 372 (1976). In the context of evaluating the public interest side of the balance, the parties in this case have vigorously disputed whether an agency must consider so-called "derivative" uses—*i. e.*, not only the intrinsic public value of the records, but also, in this case, the potential that additional, publicly valuable information may be generated by further investigative efforts that disclosure of the records will make possible.

The majority does not, in my view, refute the persuasive contention that consideration of derivative uses, whether to establish a public interest or to establish an invasion of privacy, is impermissible. Perhaps FOIA would be a more sensible law if the Exemption applied whenever disclosure would *"cause," "produce,"* or *"lead to"* a clearly unwarranted invasion of personal privacy, see, *e. g., National Assn. of Retired Fed. Employees* v. *Horner*, 279 U. S. App. D. C. 27, 32, 879 F. 2d 873, 878 (1989), cert. denied, 494 U. S. 1078 (1990)—though the practical problems in implementing such a provision would be considerable. That is not, however, the statute Congress enacted. Since the question under 5 U. S. C. § 552(b)(6) is whether "disclosure" would *"constitute* a clearly unwarranted invasion of personal privacy" (emphasis added); and since we have repeatedly held that FOIA's exemptions "'must be narrowly construed,'" *John Doe Agency* v. *John Doe Corp.*, 493 U. S. 146, 152 (1989) (quoting *Rose, supra,* at 361); it is unavoidable that the focus, in assessing a claim under Exemption 6, must be solely upon what the requested information *reveals*, not upon what it might lead to. *Arieff* v. *United States Dept. of Navy*, 229 U. S. App. D. C. 430, 436, 712 F. 2d 1462, 1468 (1983) (Scalia, J.). That result is in accord with the general policy of FOIA,

which we referred to in *Department of Justice* v. *Reporters Comm. for Freedom of Press*, 489 U. S. 749, 771 (1989), that the particular purposes for which a request is made are irrelevant.

The Court today pointedly abstains from deciding the derivative-use issue, saying that, since the record does not support the existence of any second-order public benefits, "we need not address the question whether a 'derivative use' theory would ever justify release of information about private individuals." *Ante,* at 179. I am content with that. It seems to me, however, that since derivative use on the public-benefits side, and derivative use on the personal-privacy side must surely go together (there is no plausible reason to allow it for the one and bar it for the other), the Court should have been consistent in its abstention. It should not, in the portion of its opinion discussing the privacy interest (Part III), have discussed such matters as the "retaliatory action that might result from a renewed interest in [the interviewees'] aborted attempts to emigrate," and "the fact that respondents plan to make direct contact with the individual Haitian returnees identified in the reports." *Ante,* at 177. This speculation is unnecessary to the decision since, as the Court notes, *ante,* at 176, each of the unredacted documents requested by respondents would disclose that a particular person had agreed, under a pledge of confidentiality, to report to a foreign power concerning the conduct of his own government. This is information that a person would ordinarily not wish to be known about himself—and thus constitutes an invasion of personal privacy. Cf. *Department of State* v. *Washington Post Co.*, 456 U. S. 595 (1982). Since there is nothing on the other side of the equation—the Court finding, quite correctly, that the public interests here have been "adequately served by disclosure of the redacted interview summaries," *ante,* at 178—the question whether this invasion of privacy is "clearly unwarranted"

must be answered affirmatively and the assertion of Exemption 6 must be sustained.

I choose to believe the Court's explicit assertion that it is not deciding the derivative-use point, despite what seem to me contrary dicta elsewhere in the opinion.