**DAYTON NEWSPAPERS, INC.,**
**et al., Plaintiffs,**

v.

**DEPARTMENT OF THE AIR FORCE,**
**et al., Defendants.**

**No. C–3–97–78.**

United States District Court,
S.D. Ohio,
Western Division.

March 26, 1999.

Robert P. Bartlett, Jr., Dayton, OH, for Plaintiffs.

Gregory G. Lockhart, Stuart Risch, Paul Barkhurst, Dayton, OH, for Defendants.

## DECISION AND ENTRY SUSTAINING IN PART AND OVERRULING IN PART MOTION FOR RECONSIDERATION (DOC.# 27) FILED BY DEFENDANTS UNITED STATES DEPARTMENT OF THE AIR FORCE AND UNITED STATES DEPARTMENT OF THE ARMY, THEREBY SUSTAINING IN PART AND OVERRULING IN PART THE CROSS MOTIONS FOR SUMMARY JUDGMENT FILED BY THE PLAINTIFFS (DOC. # 13) AND THE DEFENDANTS (DOC. # 18); TERMINATION ENTRY.

RICE, Chief Judge.

This litigation arises from the Plaintiffs' attempts to obtain information from the United States government pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. Pending before the Court is a Motion for Reconsideration (Doc. # 27) filed by the United States Department of the Air Force and the United States Department of the Army ("Defendants"). The Defendants seek partial reconsideration of the Court's March 31, 1998, Opinion (Doc. # 24), in which it ruled upon the Plaintiffs' various FOIA requests, sustaining in part and overruling in part cross motions for summary judgment.

As the Court noted in its March 31, 1998, Opinion, the Plaintiffs seek the disclosure of four discrete databases of information. As a means of analysis, the Court will briefly set forth its prior ruling with respect to each database, and then address the Defendants' reconsideration arguments.[1]

---

1. In their Memorandum in opposition to reconsideration, the Plaintiffs argue that the Defendants have provided the Court with new evidence and improperly raised new arguments in their Motion for Reconsideration. The Court previously noted, however, that its March 31, 1998, Opinion *was not* intended to be a final, appealable order. (Doc. # 24 at 10). The Court also specifically invited the parties to request reconsideration and to file additional submissions "on any point addressed herein." (*Id.*). Given the intricacies of the Freedom of Information Act and the databases at issue, the lack of a final, appealable order in this matter, and the Court's specific invitation for additional submissions,

I. *The Tort 2 Database and the MQAS Database*

In its March 31, 1998, Opinion (Doc. #24), the Court determined that the Plaintiffs *had not* received a requested military-wide database, compiled by the Armed Forces Institute of Pathology, known as "Tort 2." (Opinion, Doc. #24, at 3). Because the Defendants' only argument with respect to the Tort 2 database was that the Plaintiffs *had* received it, the Court found no reason to withhold the database, and ordered it furnished to the Plaintiffs.[2] (*Id.*). With respect to the MQAS database, the Court rejected the Defendants' argument that 5 U.S.C. § 552(b)(3) exempted the entire database from disclosure. (*Id.* at 6). As a result, the Court directed the Defendants to provide the Plaintiffs with all non-exempt information in the database, together with a "*Vaughn* index," describing any information that the government declined to disclose as exempt. (*Id.* at 6–7).

In their Motion for Reconsideration, the Defendants insist that the Tort 2 and MQAS databases are computer records created by or for the Department of Defense as part of a medical quality assurance program. As a result, the Defendants contend that the two databases are exempted from disclosure, in their entirety, by 5 U.S.C. § 552(b)(3) and 10 U.S.C. § 1102(a). The former provision carves out an exception to FOIA disclosure and allows a federal agency to withhold any information that is specifically exempted from disclosure by another statute. In the present case, the Defendants cite 10 U.S.C. § 1102(a) as the other statute that exempts the two databases from disclosure. That section provides for the confi-

dentiality of medical quality assurance records. It states:

(a) **Confidentiality of records.**— Medical quality assurance records created by or for the Department of Defense as part of a medical quality assurance program are confidential and privileged. Such records may not be disclosed to any person or entity, except as provided in subsection (c).[3]

Notably, § 1102 also provides that "[m]edical quality assurance records described in subsection (a) may not be made available to any person under [the Freedom of Information Act]." 10 U.S.C. § 1102(f). Another provision, 10 U.S.C. § 1102(j) defines "medical quality assurance program" and "medical quality assurance record" as follows:

(1) The term "medical quality assurance program" means any activity carried out before, on, or after November 14, 1986 by or for the Department of Defense to assess the quality of medical care, including activities conducted by individuals, military medical or dental treatment facility committees, or other review bodies responsible for quality assurance, credentials, infection control, patient care assessment (including treatment procedures, drugs, and therapeutics), medical records, health resources management review and identification and prevention of medical or dental incidents and risks.

(2) The term "medical quality assurance record" means the proceedings, records, minutes, and reports that emanate from quality assurance program activities described in paragraph (1) and are produced or compiled by the Depart-

---

the Court finds it appropriate to consider the arguments and evidence provided by the Defendants. In reaching this conclusion, the Court notes that the Plaintiffs have responded to the merits of the Defendants' reconsideration arguments and could have submitted any additional evidence that they deemed appropriate.

**2.** The Court ordered claimants' names, social security numbers, home addresses, home/work telephone numbers, and places of employment redacted pursuant to 5 U.S.C. § 552(b)(6) and the Privacy Act, 5 U.S.C. § 552(a).

**3.** Subsection (c) permits disclosure under narrowly defined circumstances not applicable in the present case.

ment of Defense as part of a medical quality assurance program.

In the present case, the Defendants insist that the entire Tort 2 and MQAS databases qualify as "medical quality assurance records," because they are records that emanate from medical quality assurance program activities designed to assess and improve the quality of health care within the Department of Defense. *See* 10 U.S.C. § 1102(j)(2). In support of this claim, the Defendants have provided the Court with declarations from Richard Granville, Deputy Chairman of the Armed Forces Institute of Pathology, and Lt. Col. Deborah Cannon, Chief of Provider Actions with the United States Medical Command. (Doc. # 27 at Exh. B, C). Granville's declaration addresses the content and purpose of the Tort 2 database. In relevant part, Granville states:

> (3) The Department of Legal Medicine, AFIP, maintains the database known as Tort 2 and reports, on a periodic basis, analyses of the data contained therein to the Office of the Assistant Secretary of Defense (Health Affairs). The purpose of this database is to support quality improvement in health care within DOD. An important mission of the Department of Legal Medicine, AFIP, is to use the Tort 2 database to assist the Office of the Assistant Secretary of Defense (Health Affairs) in implementing policy changes designed to improve the quality of health care within DOD . . . .

> (9) The Tort 2 database is a collection of sixty-three (63) data elements, or fields, concerning closed medical malpractice cases against the DOD. The Tort 2 database became operational in 1988 under the authority of DOD Directive 6025.13, the DOD Medical Quality Assurance Directive. (Exhibit C). In 1995, this Directive was consolidated with a number of other health management directive[s] into a new DOD Directive 6025.13 . . . . The Tort 2 database continues to be maintained

pursuant to DOD [regulations] . . . . The DOD's intent for the database was that data would be abstracted from every malpractice claim, and reported centrally to the Assistant Secretary of Defense for Health Affairs, to assist in assessing and monitoring the quality of medical care within the DOD.

> (10) To facilitate this process, a data collection form, Department of Defense Form 2526 (DD Form 2526) (Exh. D), was created as an enclosure to the DOD Directive. This form is used to capture information for all of the data elements of Tort 2. Each record within the Tort 2 database is an electronic version of the data contained in the DD Form 2526. The DD Form 2526 is created and maintained *only* under the quality assurance program of the medical/dental treatment facility that rendered care and the quality assurance program of the services' Surgeons General offices. This information does not travel outside of the DOD's quality assurance structure.

> (11) The Tort 2 database was created, and is maintained, in its entirety, within the DOD Quality Assurance Program. The "records" within the Tort 2 database are compiled solely as a result of this quality assurance process, designed only to assess the quality of medical care within DOD. Much of the information within the Tort 2 database—albeit not all—was *not* created, nor is it maintained outside of the Tort 2 database. More importantly, the Tort 2 database *itself* exists because of, and as part of, the DOD medical quality assurance program, and was specifically designed as a medical quality assurance record . . . .

(Doc. 27 at Exh. B).

Similarly, in her declaration, Cannon addresses the content and purpose of the MQAS database:

> (4) The Quality Management Division, MEDCOM, maintains the database known as MQAS and reports, on a periodic basis, analyses of the data contained therein through the Army Sur-

geon General to the Department of Legal Medicine, Armed Forces Institute of Pathology ("AFIP"). The clear purpose of the MQAS database is to support quality improvement in health care within the Army, and throughout the Department of Defense ("DOD") in general. The mission of the Quality Management Division, MEDCOM, is to use the MQAS database to assist the Army Surgeon General, the Department of Legal Medicine, AFIP, and the Office of the Assistant Secretary of Defense (Health Affairs) in implementing policy changes designed to improve the quality of health care within the Army and the DOD....

(9) The MQAS database is a collection of fifty-five tables. Twenty-three are primary data tables and twenty-two are secondary code tables.[4] Secondary code tables are dependent upon data entry in a primary table for creation. Each table contains information related to a different topic—e.g., "Individual Provider Data," "Incident Data," "Patient/Claimant Data." Within each table are data elements, or fields, much like the Tort 2 database fields. Each table has a different number of fields, based on the type of table involved. The information within these tables, and fields, concerns Medical Malpractice Claims, significant medical incident/event, and Adverse Actions (Credentials information). The Office of the Surgeon General, Quality Assurance Division, developed the database on June 17, 1991. The purpose behind the MQAS database was clear-the Army needed a corporate database for establishing and verifying health care provider's [sic] credentials and monitoring the quality of health care provided.

(10) All of the information within the database is part of our quality assurance records, assembled and maintained for the primary purpose of monitoring the quality of care delivered by our health care personnel.

(11) The MQAS database was created, and is maintained, in its entirety, within a DOD Quality Assurance Program. The "records" within the MQAS database are compiled as a result of this quality assurance process, designed to monitor and assess the quality of medical care within the Army and DOD and provide a means to integrate Malpractice (Tort/Claims—Tort 2 database) data and overall health care analysis. Much of the information within the Tort 2 database—albeit not all—was created, and is maintained, within the boundaries of the data collected for the MQAS database. More importantly, the MQAS database *itself* exists because of, and as part of, the DOD medical quality assurance program, and was specifically designed as a medical quality assurance record....

▇ After reviewing the foregoing declarations, as well as 10 U.S.C. § 1102, the Court finds persuasive the Defendants' contention that the Tort 2 and MQAS databases are "medical quality assurance records." The uncontroverted declarations submitted by Granville and Cannon demonstrate that the two databases are part of an overall Department of Defense medical quality assurance program designed to assess, monitor, and improve the quality of medical care provided by the military. Therefore, the Court agrees with the Defendants' assertion that the two databases are records that "emanate from quality assurance program activities." *See* 10 U.S.C. § 1102(j)(2). As such, they are rendered confidential and privileged by 10 U.S.C. § 1102(a) and expressly exempted from disclosure under FOIA by 10 U.S.C. § 1102(f).

---

**4.** Parenthetically, the Court notes an apparent error in Cannon's calculations. Twenty-three primary data tables and twenty-two secondary data tables equal forty-five tables, not fifty-five as Cannon states. This discrepancy does not appear significant, however, for purposes of the Court's ruling herein.

Indeed, in its March 31, 1998, Opinion, the Court did not dispute that the MQAS database constituted a "medical quality assurance record" under § 1102, and Cannon's declaration supports that conclusion.[5] (Doc. # 24 at 6). Rather, the Court reasoned that such quality assurance records "are protected only to the extent that they stem from an activity designed to assess the quality of medical care *and* were not created or maintained outside the medical quality assurance program." (*Id.*) (Emphasis added). Consequently, the Court ordered disclosure from the MQAS database of "any information which was not created or maintained solely for the MQAS database[.]"[6] (Id.).

■ Upon further review, the Court now concludes that 10 U.S.C. § 1102 protects the confidentiality of *all* "medical quality assurance records," regardless of whether the contents of such records originated within or outside of a medical quality assurance program. In reaching this conclusion, the Court notes that 10 U.S.C. § 1102(a) provides unambiguously that medical quality assurance records "may not be disclosed to any person or entity[.]"[7] This section does not limit the prohibition against disclosure to certain types of medical quality assurance records or to information originating within a quality assurance program. In its March 31, 1998, Opinion, however, the Court reasoned that § 1102(h) confined the scope of § 1102(a) to records "not created or maintained outside the medical quality assurance program." (Doc. # 24 at 6). In other words, relying upon § 1102(h), the Court concluded that "any information which was not created or maintained solely for the MQAS database must be produced. . . ." (*Id.*).

Section 1102(h) provides:

**(h) Application to information in certain other records.**—Nothing in this section shall be construed as limiting access to the information in a record created and maintained outside a medical quality assurance program, including a patient's medical records, on the grounds that the information was presented during meetings of a review body that are part of a medical quality assurance program.

■ After reviewing the language of this statute, the Court now finds that § 1102(h) *does not* limit the confidentiality and privilege afforded by § 1102(a) to information maintained solely within, or originating from, a quality assurance program. Rather, § 1102(h) provides that information existing or originating outside of a quality assurance program does not become confidential and privileged merely by incorporating it into a quality assurance record. In other words, nothing in § 1102 precludes the disclosure of a patient's medical files *by a hospital,* even if those files have been incorporated into a medical quality assurance record, such as the Tort 2 or MQAS database. Section 1102(h) merely stands for the proposition that a hospital or other entity may not insulate a non-privileged, non-confidential document from disclosure by filtering it through a quality assurance program. This does not mean, however, that § 1102(h) authorizes the disclosure of a patient's medical files *from a medical quality assurance record.* To the contrary, § 1102(a) renders such quality assurance records exempt from disclosure. Section 1102(h), on the other hand, makes clear that an individual is not precluded from obtaining those files *from an outside source* (i.e., a source other than the quality assurance program) simply because they may have been incorporated

---

**5.** In its March 31, 1998, Opinion, the Court did not address the "medical quality assurance record" issue in the context of the Tort 2 database, because the Defendants only raised a mootness argument to justify withholding Tort 2 data.

**6.** Once again, the Court's order allowed necessary redactions to protect privacy. (*Id.*).

**7.** As noted, *supra,* § 1102(a) includes narrowly drawn exceptions that are inapplicable in the present case, and the Plaintiffs do not suggest otherwise.

into a quality assurance record. In unambiguous language, § 1102(h) states that "[n]othing in this section shall be construed as limiting access *to the information in a record created and maintained outside a medical quality assurance program ....*" Consequently, if the Tort 2 and MQAS databases contain information that also exists in a record created and maintained outside of the government's medical quality assurance program, such information remains subject to disclosure *by that outside source.* Nothing in § 1102(h), however, negates the confidentiality and privilege afforded to medical quality assurance records by 10 U.S.C. § 1102(a).

The foregoing conclusion is consistent with the purposes of a medical quality assurance program. "Medical quality assurance programs are the primary mechanism by which the Military Departments monitor and ensure that quality medical care is provided to the Department of Defense beneficiaries. These programs involve a continuous review of the delivery of health care services within all military medical treatment facilities." Senate Report No. 99–331 (1986). Although confidentiality is an important component of such programs, quality assurance activities are not intended to insulate otherwise discoverable information from public disclosure. Consequently, to the extent that the Tort 2 and MQAS databases contain factual information derived from sources outside of the government's medical quality assurance programs, the Plaintiffs may obtain such information from those outside sources, notwithstanding the incorporation of the information into confidential and privileged quality assurance records. *Cf. Id.* ("[Section 1102] would not provide

'transactional' immunity for matters appearing in medical quality assurance records. Data from records created and information maintained outside a medical quality assurance program, such as the patient's medical records, would not be immune from discovery or use merely because they were presented during committee meetings.").

For the foregoing reasons, the Court agrees with the Defendants' argument that the Tort 2 and MQAS databases fall within the scope of 10 U.S.C. § 1102(a) and, therefore, are exempted from FOIA disclosure by 10 U.S.C. § 1102(f) and 5 U.S.C. § 552(b)(3).[8] Accordingly, the Court hereby modifies its March 31, 1998, Opinion (Doc. # 24), insofar as it ordered the Defendants to disclose the contents of the Tort 2 and MQAS databases. The contents of those databases are not subject to disclosure under FOIA, and they need not be provided to the Plaintiffs.

## II. *The AFCIMS Database and the AFLSA/JACT Database*

In its March 31, 1998, Opinion (Doc. # 24), the Court rejected the Defendants' argument that the disclosure of information contained in the AFCIMS database would impose an undue burden on the government. (*Id.* at 4). The Court also found unpersuasive the Defendants' claim that the AFCIMS database merely duplicated information found in the AFLSA/JACT database. (*Id.*). As a result, the Court ordered the Defendants to produce the AFCIMS database, subject to several redactions to protect the identity of claimants. (*Id.*). With respect to the AFLSA/JACT database, the Court noted that the Defendants had provided the

8. In opposition to this conclusion, the Plaintiffs contend that the Army has admitted that portions of the Tort 2 database are not confidential. In support, they cite Exhibit B to Richard Granville's declaration. Exhibit B is an article providing a statistical analysis of information contained in the Tort 2 database. (*See* Doc. # 27, Granville declaration, at Exh. B). The Court notes, however, that the dis-

closure of this statistical information appears to conform with 10 U.S.C. § 1102(d)(1), which provides: "Nothing in this section shall be construed as authorizing or requiring the withholding from any person or entity aggregate statistical information regarding the results of Department of Defense medical quality assurance programs."

Plaintiffs with access to 37 of 52 data fields. (*Id.* at 7). The Court then noted that the Plaintiffs had only contested the Defendants' decision to withhold six of the remaining 15 fields. (*Id.*). After setting forth these observations, the Court ordered the Defendants to disclose three of the six disputed fields, "to wit: amount paid to administrative claimants on medical malpractice claims, the type of injury alleged in a medical malpractice claim and the status of open administrative claims of medical malpractice." (*Id.* at 8). Once again, the Court tempered its disclosure determination by ordering redactions to protect the identity of individual claimants. (*Id.*).

In their Motion for Reconsideration (Doc. # 27), the Defendants "accept and largely agree with" the Court's March 31, 1998, ruling as it relates to information contained in the AFCIMS and AFL-SA/JACT databases. (*Id.* at 1). However, they ask the Court to reconsider "one discrete issue that applies to both the AF-CIMS and JACT databases, and that is the release to the public of the amount for which the Air Force settles its medical malpractice claims." (*Id.* at 2). In support of their argument, the Defendants contend that such information is protected from disclosure by two FOIA exemptions, 5 U.S.C. § 552(b)(2) and 5 U.S.C. § 552(b)(6).[9] (Doc. # 27 at 2, 8–11). The former provision precludes from disclosure matters that are "related solely to the internal rules and practices of an agency." The latter provision precludes from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."

■ After reviewing the foregoing FOIA exemptions and the parties' arguments, the Court finds the Defendants'

Motion for Reconsideration unpersuasive, insofar as it relates to the AFCIMS and AFLSA/JACT databases and the disclosure of settlement figures for malpractice claims. In their Motion for Reconsideration, the Defendants argue that the disclosure of settlement figures would interfere with claimants' personal privacy and negate their motivation to settle claims administratively. (Doc. # 27 at 8–10). In particular, the Defendants speculate that a "reporter or serious researcher" might obtain settlement figures and then comb local news articles, possibly discovering the identity of claimants and interfering with their privacy rights.

This argument is much too speculative to support the invocation of 5 U.S.C. § 552(b)(6), which, as noted above, provides a FOIA exemption when disclosure would constitute a clearly unwarranted invasion of privacy. In *Norwood v. Federal Aviation Administration*, 993 F.2d 570, 574 (6th Cir.1993), the Sixth Circuit recognized that "excluding from disclosure any and all fragments of information that might assist a diligent researcher in identifying a person ... is not supportable." The mere possibility that factual information might be pieced together to supply the "missing link," and lead to personal identification, does not exempt such information from disclosure under § 552(b)(6). *Id.* at 574–575. In its March 31, 1998, Opinion (Doc. # 24), the Court previously weighed the need for public disclosure of the settlement figures and other information against the privacy interests implicated and concluded that § 552(a) and § 552(b)(6) required the redaction of only claimants' names, social security numbers, home addresses, home/work telephone numbers, and places of employment. (Doc. # 24 at 3, 4, 8). After reviewing the Defendants'

---

**9.** In its substantive analysis, the Defendants' Motion for Reconsideration only addresses the disclosure exemptions set forth in 5 U.S.C. § 552(b)(2) and (b)(6). (Doc. # 27 at 2, 8–11). In a concluding paragraph, however, the Defendants recap their argument by citing § 552(b)(2), (b)(3), and (b)(6). (*Id.* at 12). In any event, as noted above, § 552(b)(3) applies when another statute specifically exempts information from disclosure, and the Defendants have cited no statute exempting the release of settlement data.

Motion for Reconsideration, the Court finds no persuasive reason to modify its prior ruling, with respect to the release of settlement figures, based upon privacy concerns implicating § 552(b)(6).

■ The Court also finds unpersuasive the Defendants' reliance upon 5 U.S.C. § 552(b)(2) as a basis for exempting malpractice settlement figures from disclosure. As noted above, that exemption excludes from FOIA's reach any matters related solely to the internal personnel rules and practices of an agency. In the present case, the Court cannot envision "internal personnel rules and practices" encompassing the raw dollar amounts for which the Defendants have settled medical malpractice claims.[10] In their Motion, the Defendants concede that the settlement figures "are not themselves the regulations and manuals generally protected under [§ 552](b)(2)." (Doc. 27 at 10). Nevertheless, they argue that the release of such information would compromise the government's bargaining position. Even if this assertion is true, however, the Defendants have failed to meet their burden of proving that the settlement figures fall within any applicable FOIA exemption. *United States Dep't of State v. Ray*, 502 U.S. 164, 173, 112 S.Ct. 541, 116 L.Ed.2d 526 (1991). Absent the Defendants' ability to demonstrate the applicability of a FOIA exemption, the settlement figures are presumed to be subject to disclosure. In the present case, the Defendants have not met their burden. Accordingly, their Motion for Reconsideration (Doc. # 27) is overruled, insofar as it relates to disclosure of the amounts for which the government has settled its medical malpractice cases.

### III. *Conclusion*

Based upon the foregoing analysis, the Court hereby SUSTAINS the Defendants' Motion for Reconsideration (Doc. # 27) in part and OVERRULES it in part. The Motion is sustained insofar as it seeks to prevent the disclosure of information contained in the Defendants' Tort 2 and MQAS databases. The Court finds the information contained in those databases protected from disclosure, in its entirety, by 5 U.S.C. § 552(b)(3), via 10 U.S.C. § 1102(a) and (f). The Court overrules the Defendants' Motion, however, as it relates to disclosure of information contained in the AFCIMS and AFLSA/JACT databases. The information contained in those databases is subject to disclosure to the extent previously set forth in the Court's March 31, 1998, Order (Doc. # 24). In light of the foregoing conclusions, and as set forth above, the Plaintiffs' Motion for Summary Judgment (Doc. # 13) is SUSTAINED in part and OVERRULED in part. Likewise, the Defendants' Motion for Summary Judgment (Doc. # 18) is SUSTAINED in part and OVERRULED in part.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

---

10. In a declaration attached to the Defendants' Motion for Reconsideration, Col. Steven Linder contends that settlement data should not be disclosed, but he does not rely upon § 552(b)(2). Rather, he cites § 552(b)(5) and (b)(6). The Court has addressed the (b)(6) privacy exemption in its analysis above. In its March 31, 1998, Opinion, the Court rejected the Defendants' reliance upon § 552(b)(5), which exempts certain inter-agency or intra-agency memoranda or letters. The Defendants make no argument in their Motion for Reconsideration supporting application of the (b)(5) exemption, and the Court finds no persuasive reason to modify its March 31, 1998, ruling, in which it found the exemption inapplicable to settlement figures. (Doc. # 24 at 8–9).