N.R. SMITH, Circuit Judge,
concurring in part and dissenting in part:
I respectfully dissent from Part A.2 of the majority opinion, because the government has not borne its burden of showing that the Notices of Seizure fall within the “trade secrets” exemption, 5 U.S.C. § 552(b)(4) (“Exemption 4”). Otherwise, I concur in the majority opinion.
I.
Although FOIA provides nine enumerated exemptions allowing the government to withhold certain information from the public, 5 U.S.C. § 552(b), there is a “ ‘strong presumption in favor of disclosure,’ ” Lahr v. Nat'l Transp. Safety Bd., 569 F.3d 964, 973 (9th Cir.2009) (quoting U.S. Dept. of State v. Ray, 502 U.S. 164, 173, 112 S.Ct. 541, 116 L.Ed.2d 526 (1991)). Consistent with the presumption in favor of disclo *1200 sure, we must construe the exemptions narrowly. Id. (citation omitted). “An agency that invokes one of the statutory exemptions to justify the withholding of any requested documents or portions of documents bears the burden of demonstrating that the exemption properly applies to the documents.” Id.; see U.S. Dep’t of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 755, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989).
Here, the parties dispute whether the commercial information in the Notices of Seizure is “confidential” within the meaning of Exemption 4. The exemption “prevents disclosure of (1) commercial and financial information, (2) obtained from a person or by the government, (3) that is privileged or confidential.”[1] GC Micro Corp. v. Def. Logistics Agency, S3 F.3d 1109, 1112 (9th Cir.1994). “Confidential” material means information whose disclosure is “likely to ... cause substantial harm to the competitive position of the person from whom the information was obtained.” Id. Substantial harm “should not be taken to mean simply any injury to competitive position.... ” Pub. Citizen Health Research Group v. F.D.A., 704 F.2d 1280, 1291 n. 30 (D.C.Cir.1983) (quotation marks and citation omitted). Instead, substantial harm is determined by the “harm flowing from the affirmative use of proprietary information by competitors.” Id. Although “the court need not conduct a sophisticated economic analysis of the likely effects of disclosure!,] ... [e]onclusory and generalized allegations of substantial competitive harm ... are unacceptable and cannot support an agency’s decision to withhold requested documents.” Id. at 1291 (citations omitted); see GC Micro Corp., 33 F.3d at 1115. The parties opposing disclosure need not show actual competitive harm, but must produce “evidence revealing (1) actual competition[in the relevant market] and (2) a likelihood of substantial competitive injury....” GC Micro Corp., 33 F.3d at 1113 (citation omitted; alteration added).
CBP failed to meet this burden. Even assuming CBP can establish, a priori, that the markets for all products imported into the United States are “actually competitive,” it did not demonstrate in this record a likelihood of substantial competitive injury to importers whose products have been seized as counterfeit. The Agency asserted in its affidavits to the district court that disclosure of the Notices of Seizure would:
(1) “provide competitors, presumably other importers, with valuable insight into importers’ supply chains, patterns of importation and distribution, assessments of customer demands and business relationships”; (2) be unfair to importers who “expend considerable sums of money to locate and establish business relationships with manufacturers and suppliers of merchandise in the overseas market place” because “the importer could be cut out entirely of various business transactions, as consignees or distributors seek to deal directly with the manufacturer, without the importer’s participation”; and (3) “may lead consumers to believe that the importer identified in the Notice does business in counterfeit goods.”
A.
On de novo review, allegations (1) and (2) are meritless, because they make only speculative and generalized statements about the potential consequences of disclo *1201 sure. First, the information in the Notices of Seizure provides questionable added utility to competitors. The Notices include: (1) the date of importation; (2) the port of entry; (3) a description of the merchandise; (4) the quantity involved; (5) the name and address of the manufacturer; (6) the country of origin; (7) the name and address of the exporter; and (8) the name and address of the importer. See 19 C.F.R. § 133.21(c). The only information in the Notice that has not already been publicly disclosed in the carrier manifest is the name and address of the importer’s manufacturer and exporter.[2] Thus, assuming a competitor could actually discover “patterns of importation and distribution and assessments of customer demands” from a single Notice of Seizure, the Notice reveals little information that could not already be gleaned from public shipping manifests.
Further, CBP fails to explain how revealing an importer’s supplier of illicit goods creates a “likelihood of substantial competitive harm.” Notices of Seizure are issued only after CBP officials discover and detain items with a “spurious trademark that is identical to, or substantially indistinguishable from, a registered trademark.” 19 C.F.R. § 133.21(a)-(c); see id. § 133.22(a). If an importer cannot obtain written permission from the trademark owner to import counterfeit articles during the detention period, the articles are forfeited, see id. § 133.21(b), § 133.22(b)-(c), and the importer incurs substantial civil fines, see 19 U.S.C. § 1526(f).[3] The Agency also makes samples of the counterfeit articles available to the trademark owner “for examination, testing, or other use in pursuit of a related private civil remedy for trademark infringement.” Id. § 133.21(d).
Thus, competitors have a significant incentive not to work with manufacturers and other supply chain entities implicated in a counterfeiting seizure. The last supply network a reputable importer would want to mirror is one involving manufacturers and exporters either suspected of or implicated in a counterfeiting operation, because future shipments from those entities will be subjected to additional scrutiny from the U.S. government. The mere suspicion of counterfeiting risks costly delays and legal entanglements that could jeopardize an importer’s reputation and future business with aggrieved clients. If manufacturers implicated in a Notice of Seizure are indeed involved in counterfeiting — as most of them presumably are — developing a business relationship with them would only invite investigations and set importers up for crushing civil penalties and shipment forfeiture. The notion, then, that competitors will rush to exploit information about manufacturers and exporters *1202 implicated in a Notice of Seizure is, at best, doubtful.
In the minority of cases where a shipment is seized by mistake, the situation is decidedly different. Disclosing the Notice of Seizure could plausibly reveal valuable information about an importer’s legitimate supply chain network. However, here, the Agency failed to inform us if any of the Notices requested by Watkins involved mistaken seizures. It simply explained that “a seizure notice reflects only a suspicion that the goods at issue are counterfeit.” This explanation ignores the fact that seizure involves mandatory detention of the goods, and the importer then bears the burden of proving the goods are not illicit contraband at the risk of forfeiting the shipment, incurring substantial fines, and subjecting itself to civil counterfeiting liability to the rightful trademark owner. As such, a Notice of Seizure represents much more than mere “suspicion” of counterfeiting — it creates a rebuttable presumption of counterfeiting liability.
Even if a case could be made for exempting from disclosure those Notices of Seizure that involve mistaken detainment, CBP did not identify which of the Notices would meet such description. Indeed, the Agency’s affidavits and briefs provide no details about the specific Notices requested by Watkins, averring rather that because some of the Notices might reveal trade secrets, all of the Notices should be exempted from disclosure. Yet, as even the majority acknowledges, “generalized allegations of substantial competitive harm ... are unacceptable and cannot support an agency’s decision to withhold requested documents.” Public Citizen, 704 F.2d at 1291 (emphasis added). Therefore, on de novo review, the Agency failed to rebut the “strong presumption in favor of disclosure,” see Lahr, 569 F.3d at 973, because its allegations do not “demonstrate] that the exemption properly applies to [all ] the documents” requested by Watkins, id. (citing Ray, 502 U.S. at 173, 112 S.Ct. 541) (alteration added); see Public Citizen, 704 F.2d at 1291 n. 30.
B.
Finally, allegation (3) — which complains that consumers may be led “to believe that the importer identified in the Notice does business in counterfeit goods” — does not address a competitive injury cognizable under Exemption 4. It focuses on the revelation of potentially embarrassing information to consumers, not the revelation of proprietary information to competitors. See 5 U.S.C. 552(b)(4); Pub. Citizen Health, 704 F.2d 1280, 1291 n. 30 (“We emphasize that ... competitive harm in the FOIA context ... [is] limited to harm flowing from the affirmative use of proprietary information by competitors.” (citation omitted)).

. The Act specifically provides: "(b) This section [requiring disclosure of information] does not apply to matters that are— (4) trade secrets and commercial or financial information obtained from a person and privileged or confidential...." 5 U.S.C. § 552(b)(4).

. Carriers must file manifests with the CBP (which are publicly disclosed) that provide descriptive details of their cargo, including: (1) the name and address of the importer and the name and address of the shipper; (2) the general character of the cargo; (3) the number of packages and gross weight; (4) the name of the vessel; (5) the seaport of loading; (6) the seaport of discharge; (7) the country of origin of the shipment; and (8) the trademarks appearing on the goods or packages. See 19 U.S.C. § 1431(c). Although carriers or importers can file for an exemption to the public disclosure requirements under 19 U.S.C. § 1431(c)(2), or apply for confidential treatment with CBP under § 1431(c)(1)(A), this was apparently not an issue for any of the shipments in this case.

. The fine for “any person who directs, assists financially or otherwise, or aids and abets the importation of [counterfeit] merchandise ... that is seized’’ may be up to "value that the merchandise would have had if it were genuine, according to the manufacturer’s suggested retail price....” 19 U.S.C. § 1526(f)(1)-(2). The fine for a second seizure may be up to “twice the value that the merchandise would have had if it were genuine .... ” Id. § 1526(f)(3).