2008 UT 26

**DESERET NEWS PUBLISHING COM-
PANY, publisher of the Deseret Morn-
ing News, Plaintiff and Appellant,**

v.

**SALT LAKE COUNTY, a political subdivi-
sion of the State of Utah, and the Salt
Lake County District Attorney's Office,
Defendants and Appellees.**

No. 20060454.

Supreme Court of Utah.

March 28, 2008.

Jeffrey J. Hunt, David C. Reymann, Michael T. Hoppe, Salt Lake City, for plaintiff.

Lohra L. Miller, Valerie M. Wilde, Salt Lake City, for defendants.

NEHRING, Justice:

## INTRODUCTION

¶ 1 In this appeal, we are called upon to decide whether Salt Lake County's decision to deny the Deseret Morning News access to an investigative report of alleged sexual harassment was a lawful application of Utah's Government Records Access and Management Act, commonly known as GRAMA. The district court concluded that the County properly withheld the report. We disagree and reverse.

## BACKGROUND

¶ 2 In November 2003, while Marcia Rice was an employee of the Salt Lake County Clerk's Office, she filed a sexual harassment complaint against the office's chief deputy, Nick Floros. According to Ms. Rice, Mr. Floros helped her obtain a position for which she was unqualified, targeted Ms. Rice for his highly inappropriate sexual advances once she began her employment, and retaliated against her when she refused to submit to his libidinal overtures. Ms. Rice further claimed that Mr. Floros previously engaged in similar conduct with at least one other female employee and that county officials

knew of Mr. Floros's inappropriate behavior and failed to respond.

¶ 3 Under Salt Lake County's Personnel Policy No. 5730, allegations of sexual harassment are to be investigated within fifteen calendar days of receipt of a written complaint. When Salt Lake County Clerk Sherrie Swensen learned of Ms. Rice's complaint, she placed Mr. Floros on administrative leave pending the outcome of an investigation. Citing her desire to ensure objectivity in the investigation and her long-term professional relationship with Mr. Floros, Ms. Swensen referred the investigation to the Salt Lake County District Attorney's Office.

¶ 4 District Attorney David Yocom retained two independent attorneys with experience in employment law to conduct the investigation and prepare a list of findings and recommendations. The investigating attorneys interviewed Ms. Rice, Mr. Floros, Ms. Swensen, and several other current and former county employees. Based on these interviews and a review of relevant documents, the investigators compiled a twenty-three-page investigative report. In February 2004, three days before the investigators delivered the report to Mr. Yocom, Mr. Floros retired.

¶ 5 The District Attorney's Office reviewed the report and sent Ms. Rice a summary of its contents. The summary is a public document, and it received extensive media coverage. According to the summary, the investigators concluded that the evidence substantiated Ms. Rice's complaint that Mr. Floros's conduct constituted "egregious violations" of county policy. It concluded that Mr. Floros, were he still employed with the County, should be immediately terminated and considered ineligible for future employment. The summary did not indicate whether the full investigative report addressed Mr. Floros's alleged history of sexual misconduct or whether the investigative report reached any conclusions concerning the manner in which Mr. Floros's superiors dealt with complaints about his conduct.

¶ 6 Armed with the summary, Ms. Rice filed a notice of claim with the United States Equal Employment Opportunity Commission in July 2004. Several weeks later, the EEOC determined that reasonable cause existed to believe Ms. Rice had been the victim of sexual harassment and unlawful retaliation at the hands of Mr. Floros. In October 2004, Ms. Rice filed a federal civil rights lawsuit against the County, Ms. Swensen, and Mr. Floros, alleging sexual harassment and retaliation, which she eventually settled.

¶ 7 Meanwhile, a Deseret Morning News reporter, dissatisfied with the information contained in the summary, submitted a request authorized by GRAMA for a copy of the full investigative report. The County denied the reporter's GRAMA request, citing its policy to withhold from public access records "that are considered protected, confidential and/or private." In short order, the newspaper's lawyer challenged the County's denial. The lawyer asked the County to support its denial with specific statutory authority. The District Attorney's Office promptly replied with the information mandated by GRAMA to be included in a notice of denial. *See* Utah Code Ann. § 63–2–205(2) (2004).

¶ 8 GRAMA permits classifying as either "private" or "protected" any records that contain information that, if disclosed, would constitute a "clearly unwarranted invasion of personal privacy." *Id.* § 63–2–304(25). The District Attorney claimed that the Floros investigative report was such a document. The District Attorney next claimed that the report was "protected" because it was "created or maintained for … administrative enforcement [or disciplinary] purposes," and that its release "reasonably could be expected to interfere with investigations undertaken for enforcement, discipline, licensing, certification, or registration purposes."[1] *Id.* § 63–2–304(9). Finally, the District Attorney explained that the investigative report was classified as "protected" by express designation in the County's personnel policy governing sexual harassment.

---

1. Although the County originally cited section 63–2–304(17), which provides for protection of "records disclosing an attorney's work product," as grounds for its refusal to release the report, this provision is not at issue in this case.

¶ 9 The Deseret Morning News disagreed with the County's classifications. It first lodged an administrative appeal with Salt Lake County's Government Records Access Management Policy Administration Hearing Board. After a hearing, the Board denied the newspaper's request. The Board concluded that the County had properly classified the report and its contents. The newspaper then appealed to the Salt Lake County Council. Before the Council, the District Attorney objected to the newspaper's request that Council members review the report in camera. He contended that the contents of the report were irrelevant to determining whether the County had properly classified it. The District Attorney also contended that the Council, despite being empowered to rule on the newspaper's appeal, need not look at the report's contents before passing judgment on its status under GRAMA. He anchored his resistance to disclosing the contents of the report in the text of GRAMA, but some, including the newspaper and Republican Party members of the Council, suspected other motives. They looked at the County's zealous protection of the report and suspected a political cover-up. Because many of the key players, notably the District Attorney and the County Clerk, were members of the Democratic Party serving in elected posts, Republican members of the Council charged that Democrats were helping keep the embarrassing details of the report from public view. The report, they believed, would direct unflattering light on the workplace environment in the County Clerk's Office and on its attitude toward sexual harassment allegations directed at high-level employees.

¶ 10 Rather than continue their skirmish over the propriety of in camera review by the Council, the newspaper and the County agreed to bypass the Council and move their dispute to court. The newspaper then began the lawsuit that resulted in this appeal.

¶ 11 District courts review record denials under GRAMA de novo. *Id.* § 63-2-404(7)(a). In the course of conducting its review of the disputed record, a court may consider and weigh interests and public policies bearing on whether the record should be disclosed. The newspaper and the County filed cross-motions for summary judgment on the issue of whether the report was properly classified under GRAMA. Although the County contended that the district court could affirm the County's classification decision as a matter of law, it argued that the weighing of interests and public policy to be undertaken by the court was a fact-intensive task beyond the reach of summary judgment. After conducting an in camera review of the report, the district court agreed with the County and issued a memorandum decision ruling that the County had properly classified the report and deferred its weighing of interests and public policy until it could gather facts. The newspaper appealed.

## ISSUES AND STANDARD OF REVIEW

¶ 12 The Deseret Morning News attributes several errors to the district court. The newspaper insists that the court was wrong when it declined to weigh interests and public policy as part of its assessment of whether the County had properly classified the report. It argues that had the district court not deferred its examination of these considerations, the court could have, and should have, ruled the report public as a matter of law. Through this appeal, we are called upon to decide how governmental entities go about the work of classifying records under GRAMA and how an entity's classification responsibilities shape the distribution of burdens between record requesters and governmental entities upon judicial review of a denied record request. These issues present questions of statutory interpretation that we review for correctness, affording no deference to the district court's legal conclusions. *E.g., R.A. McKell Excavating, Inc. v. Wells Fargo Bank, N.A.*, 2004 UT 48, ¶ 7, 100 P.3d 1159.

## ANALYSIS

### I. OVERVIEW OF GRAMA

¶ 13 The Legislature enacted GRAMA to advance the cause of governmental transparency and accountability. When it explained why GRAMA was necessary, the Legislature expressed the view that both the

right of access to information concerning the conduct of the public's business and the right of individual privacy concerning personal information acquired by governmental entities were entitled to constitutional protection. Utah Code Ann. § 63–2–102(1) (2004). Although both of these interests deserve constitutional dignity, they do not enjoy an altogether harmonious relationship. The provisions of GRAMA provide a rational framework for mediating the conflicts between these interests.

¶ 14 In addition to citing constitutional reasons for enacting GRAMA, the Legislature noted that the public policy of this state required that access to certain forms of information be restricted. *Id.* § 63–2–102(2)–(3). The Legislature's commitment to governmental transparency is reflected in GRAMA's declaration that "[a] record is public unless otherwise expressly provided by statute." *Id.* § 63–2–201(2). Moreover, although GRAMA contains a lengthy roster of records that are presumptively public, *id.* § 63–2–301(1)–(3) (Supp.2007), the statute cautions that this list "is not exhaustive and should not be used to limit access to records," *id.* § 63–2–301(4).

¶ 15 GRAMA strives to accomplish its legislative goals by creating a government records classification system. The most general classification segregates public from nonpublic records. GRAMA then creates three categories of nonpublic records: private, *id.* § 63–2–302 (2004); controlled, *id.* § 63–2–303; and protected, *id.* § 63–2–304. Only the private and protected categories of nonpublic records concern us here.

¶ 16 To assist a governmental entity with the task of classifying its records, GRAMA details attributes unique to each of the three nonpublic categories. While GRAMA identifies in detail many types of information and assigns classifications to them, GRAMA's taxonomy is not exhaustive. For example, investigative reports of sexual harassment complaints are not classified. *See id.* §§ 63–2–302 through –304. GRAMA anticipates that its inventory of records does not classify every governmental record and sets out procedures for classifying records that have

escaped statutory classification. These classification procedures focus on properly identifying and balancing interests associated with a record. For example, if a record fits into more than one category, GRAMA authorizes a governmental entity to select one "by considering the nature of the interests intended to be protected and the specificity of the competing provisions." *Id.* § 63–2–305(1). To facilitate classification, GRAMA permits a governmental entity to divide a record into its public and nonpublic parts by redacting nonpublic content. *Id.* § 63–2–307. Moreover, to ease the burden of record classification, GRAMA does not impose upon a governmental entity a duty to classify a record unless "access to the record is requested," *id.* § 63–2–306(2), but it may reclassify or redesignate its records at any time, *id.* § 63–2–306(3).

## II. THE DISTRICT COURT OWED NO DEFERENCE TO THE COUNTY'S ADVANCE CLASSIFICATION OF SEXUAL HARASSMENT INVESTIGATIVE REPORTS

¶ 17 Although GRAMA does not classify sexual harassment investigative reports, the County's personnel policy relating to sexual harassment classifies them as "protected." Salt Lake County Personnel Policy & Procedure, 5730 Sexual Harassment 4.3.1 (2004). This categorical classification created by county policy, while permitted by GRAMA under Utah Code section 63–2–306(2) (2004), does not endow a specific report with a presumption that it should be withheld if requested. Unlike a governmental entity's classification of a type of record[2] containing information expressly classified by GRAMA, the County's classification of sexual harassment investigative reports represents, at most, a prediction of how a particular investigative report would be treated if a request were made to make it public.

¶ 18 To be sure, under some circumstances, most investigative reports concerning allegations of sexual harassment could qualify for nonpublic status under one or more provisions of GRAMA. For example, a

**2.** GRAMA uses the term "[r]ecord series." Utah Code Ann. § 63–2–103(23) (Supp.2007).

report of an ongoing investigation "reasonably could be expected to interfere with investigations undertaken for enforcement, discipline, licensing, certification, or registration purposes." *Id.* § 63–2–304(9)(a) (2004). More plausible still is the possibility that a sexual harassment investigative report contains information that "constitute[s] a clearly unwarranted invasion of personal privacy, or [allow] disclosure [that] is not in the public interest." *Id.* § 63–2–304(25). Finally, one might even imagine a sexual harassment investigative report that "reasonably could be expected to disclose investigative or audit techniques, procedures, policies, or orders not generally known outside of government ... [and result in] disclosure [that] would interfere with enforcement or audit efforts." *Id.* § 63–2–304(9)(e). Still, despite the authority granted the County by GRAMA to classify the entire category of sexual harassment investigative reports in advance, it is certainly possible that none of these statutory provisions would justify withholding access to a particularly requested report.

¶ 19 When the County defended its denial of the newspaper's request for access to the report, it was not so much defending its decision on the Floros report as it was defending its classification policy for all sexual harassment reports. Thus, when the County cited the GRAMA provision exempting from disclosure a record that "constitutes a clearly unwarranted invasion of personal privacy" as a ground for denying the newspaper's request, it was claiming that all investigative reports of sexual harassment complaints qualify for this exemption. When the County contended that no one, not even those empowered to rule on the newspaper's appeals, should see the contents of the report, it confirmed that as far as it was concerned, its advance classification of sexual harassment investigative reports rendered unnecessary any additional GRAMA review. Faced with a GRAMA request for a particular sexual harassment report, the County could not deny access based solely on its advance categorical classification. Instead, GRAMA required the County to examine and evaluate the GRAMA status of the Floros report in the context of the interests relevant to its content alone. Thus, while some sexual harassment investigations may not have stirred suspicions of efforts to shield partisan public officials from scrutiny, the Floros investigation did, and justifiably so. The County's reluctance to disclose the contents of the report to the Council merely reinforced this perception. By protesting any disclosure, however, the County was asserting that the contents of the Floros report were irrelevant to assessing the correctness of the County's classification. Only the merits of classifying all sexual harassment investigative reports as "protected" mattered. We take issue with this position as being incompatible with GRAMA.

¶ 20 The County's policy of classifying all sexual harassment investigative reports as "protected" would never be sufficient, standing alone, to justify denying a request for access to such a report. We agree that the assignment of a primary classification to a record series in advance of a record request is a prudent policy. Advance classification offers organizational structure that supports record retention and management practices. Advance classification may also provide an important starting point when a governmental entity is confronted with a request for all, or a significant part, of a record series, where passing judgment on each record individually would be impractical. Advance classification is, however, of little or no relevance when evaluating a request for the disclosure of a single record within a record series that does not bear an express GRAMA classification.

¶ 21 GRAMA does not permit the County to defend its denial of access with this simple syllogism: the County reasonably classified all sexual harassment investigative reports "protected"; the Floros investigative report concerned an allegation of sexual harassment; therefore the report is "protected."

¶ 22 As an alternative to classifying a record series, GRAMA authorizes a governmental entity to "designate" a classification for it. *Id.* § 63–2–306(1). When a governmental entity designates records, it assigns a primary classification based on how, in its experience, a majority of the records in the series would be classified should the occasion arise to classify them. Although the County

chose to classify sexual harassment investigative reports instead of designating them, that choice conferred no greater presumption of the correctness of the record's status under GRAMA. The County presumably had the expertise to predict what classification a majority of sexual harassment investigative reports would bear but had no ability to predetermine how any particular report should be classified. That judgment could be made only after the County reviewed the content of the requested investigative report and took into account the competing interests of public access versus restricted disclosure. A governmental entity's commitment to perform this important work of interest identification and balancing is essential if GRAMA's aims are to be realized. It is work that a governmental entity cannot sidestep by electing to classify a record series in advance, as contrasted to designating the record series.

¶ 23 By functionally merging the classification and designation of records we have not wholly deprived the two terms of any separate meaning. For example, a governmental entity's advance classification of a record series, as distinguished from designation, may be entitled to greater deference than its designation when the record series is comprised of records expressly classified by GRAMA. Sexual harassment investigative reports do not appear, however, within any statutory classification. Here, the County was required to conduct an individualized assessment of the Floros report, its primary classification notwithstanding.

## III. GRAMA REQUIRES THE COUNTY TO CONDUCT A CONSCIENTIOUS AND NEUTRAL ASSESSMENT OF THE FLOROS REPORT

 ¶ 24 When the County received the newspaper's request, it assumed the statutory responsibility to determine the report's classification status by taking into account the entire scope of GRAMA, including its expressions of legislative intent, its presumptions favoring access, and its mandate that when competing interests fight to a draw, disclosure wins.[3] This duty is reflected in GRAMA's requirement that denial letters contain citations to the provisions of the statute supporting the denial. It would be incompatible with a governmental entity's responsibilities under GRAMA to apply to a record request a review methodology which presumes that a requested record has been properly classified and then proceed to canvass GRAMA for statutory language that confirms its designation. Here, the County was required to conduct a conscientious and neutral evaluation of the report's GRAMA status without regard to existing designations or classifications.[4] This obligation continues throughout the appeal process. If a governmental entity becomes aware that circumstances that contributed to the denial of a record request have changed during the appeal, or before another request is received for the same record, the legislative intent and statutory structure of GRAMA requires the entity to reassess the classification of the record and, if appropriate, alter its classification as permitted by section 63-2-306.

## IV. GRAMA MANDATES THAT THE DESERET MORNING NEWS BE GRANTED ACCESS TO THE FLOROS INVESTIGATIVE REPORT

 ¶ 25 GRAMA does not contemplate adversarial combat over record requests. It instead envisions an impartial, rational balancing of competing interests.

---

3. The policy of requiring disclosure of a record when "countervailing interests are of equal weight," found in GRAMA's statement of legislative intent, Utah Code Ann. § 63-2-102(3)(e) (2004), conflicts with the standard to be applied by courts hearing reviews of GRAMA rulings. Under this standard a court may order disclosure "if the interest favoring access outweighs the interest favoring restriction of access." *Id.* § 63-2-404(8)(a). We hold that the conflicting "outweighs" standard must yield to the clear and preeminent expression of legislative intent.

4. *Cf. U.S. Dep't of State v. Ray,* 502 U.S. 164, 173, 112 S.Ct. 541, 116 L.Ed.2d 526 (1991) (indicating that the purpose and plain language of the federal Freedom of Information Act, which also promotes access to public records, creates "the strong presumption in favor of disclosure [that] places the burden on the agency to justify the withholding of any requested documents").

To be sure, a requesting party may disagree with the governmental entity over the classification of a record, but the overriding allegiance of the governmental entity must be to the goals of GRAMA and not to its preferred record classification. When a governmental entity follows this approach, the requesting party can be assured upon receiving a denial that the entity has honored the purpose and intent of GRAMA and that the grounds cited in the denial were not uncovered in a single-minded quest for reasons to turn away the record request.

¶ 26 Under the proper GRAMA evaluative regimen, a governmental entity must weigh competing interests in the first instance. Here, the County took a contrary view, insisting that GRAMA contemplated a preliminary review of the propriety of its initial classification of the Floros report without weighing interests. The County persuaded the district court to endorse this view. Having rejected the County's analytical approach, we reverse the district court ruling based on it.

¶ 27 We also conclude that the district court erred when it concluded that the newspaper should be denied the Floros report because its contents fell within the two GRAMA provisions cited by the County to justify its classification: a clearly unwarranted invasion of personal privacy and interference with an investigation. Utah Code Ann. § 63–2–304(9)(a), (25) (2004).

### A. The Floros Investigative Report Does Not Constitute a Clearly Unwarranted Invasion of Personal Privacy

¶ 28 GRAMA classifies private records into two categories. The first acquires its status by virtue of its inherently personal nature; for example, a record pertaining to medical treatment or eligibility for social welfare benefits. Utah Code Ann. § 63–2–302(1)(a)

(Supp.2007). This category is not at issue here.

¶ 29 The second private record category, the one in which the County seeks to place the Floros investigative report, includes "other records containing data on individuals the disclosure of which constitutes a clearly unwarranted invasion of personal privacy." Id. § 63–2–302(2)(d).[5]

¶ 30 As we observed above, the content of an investigative report of a sexual harassment allegation could by its nature be expected to invade privacy. It is also possible that considerations of public interest might push aside concerns over even the most intimate, embarrassing, and humiliating episodes of human sexual behavior. GRAMA's private and protected classification of records that "constitute[ ] a clearly unwarranted invasion of personal privacy" does not sanction denying access to a record merely because it invades personal privacy. To qualify for nonpublic classification a record must not only invade personal privacy, it must do so in a "clearly unwarranted" manner. Id.

¶ 31 Many factors may contribute to a determination of whether an invasion of personal privacy is warranted. These include the central consideration here: whether elected public officials failed to respond properly to sexual harassment that might, without the presence of possible administrative misconduct, meet the standard of "clearly unwarranted invasion of personal privacy." Id.

¶ 32 The County argues that it properly classified the investigative report as private under section 63–2–302(2)(d) because, as a matter of law, its disclosure would unnecessarily invade the privacy interests of the alleged victim, the alleged perpetrator, and

---

5. GRAMA makes the privacy category available only for records that have been "properly classified by a governmental entity." Utah Code Ann. § 63–2–302(2). This is a puzzling and circular condition to impose on a record, the proper classification of which depends upon whether its disclosure constitutes a clearly unwarranted invasion of personal privacy. The County suggests that "properly classified" contemplates a "primary classification" process of the kind performed here. Moreover, the County implies that GRAMA's "properly classified" language requires a court to first examine and defer to its primary classification of the Floros report. While this statutory language remains an enigma to us, we are satisfied that it does not give us cause to defer to the County's primary classification of the Floros record.

other persons participating in the investigation. We disagree.

¶ 33 As we observed above, a record may not be withheld merely because its contents invade personal privacy. Instead, the invasion must be clearly unwarranted. The presence of this limiting provision inevitably calls on a governmental entity, when classifying a record, to consider matters other than whether and to what degree a record invades personal privacy. In the realm of GRAMA, these other matters are nothing more or less than the constitutional and public policy interests that GRAMA insists be placed on the scales that weigh whether or not a record ought to be made public. We therefore hold that section 63–2–302(2)(d) necessarily demands an expansive and searching evaluation of the interests that might make an invasion of personal privacy warranted. We further hold that the district court erred when it declined to gather and weigh relevant interests before accepting the County's classification of the Floros investigative record.[6] While the district court did not conduct a balancing of the interests, the record before us is more than sufficient to perform the task. We begin by examining the potential invasions of personal privacy that might be suffered should the investigative report be released.

¶ 34 Thirteen of the sixteen people who were interviewed for the investigative report were never identified by name or job description. The investigators referred to these individuals exclusively by aliases, a precaution that substantially diminishes the risk of invading the personal privacy of third-party witnesses.

¶ 35 We are aware, as the County suggests, that it could be possible for a dedicated and enterprising person to derive the identities of one or more witnesses regardless of the precautions taken to preserve their anonymity. We also note that a breach in confidentiality might expose witnesses to unwanted attention. We even concede that it might be conceivable, but only remotely so, that the unintended disclosure of the identity of witnesses in the investigation of Mr. Floros might give pause to those who may be sought out for information in future investigations.

¶ 36 We conclude, however, that these hypothetical, untoward events are too improbable to merit assigning them weight on the side of the scales favoring withholding the report. Indeed, as the newspaper indicated in its argument to the district court, the record contains "no evidence to show that if the report is released that people in the office or in the public or anyone will be able to connect the dots and figure out who these people are." The newspaper further indicated that the County "couldn't figure out who the employees were that are being talked about under the alias[es]" in documents submitted to the district court. This endorsement of the effectiveness of the precautions undertaken by the investigators to preserve the anonymity of witnesses would likely inspire the confidence of those called upon to be witnesses in future investigations.

¶ 37 Unlike witnesses whose true names were not revealed in the report, the report referred to Ms. Rice, Mr. Floros, and Ms. Swensen by name. We do not consider, however, the disclosure of their identities to amount to a clearly unwarranted invasion of personal privacy.

¶ 38 Ms. Rice cannot reasonably argue that the release of the report would significantly implicate her personal privacy interests. As the district court indicated, Ms. Rice made the choice to disclose her identity and publicize the allegations against Mr. Floros. Several publicly available documents, including Ms. Rice's complaint filed in federal court, contain personal details of the same nature as the investigative report.

---

6. Our interpretation of the phrase "clearly unwarranted invasion of privacy" finds support in the United States Supreme Court's interpretation of identical language contained in the federal Freedom of Information Act. *E.g., U.S. Dep't of State v. Ray*, 502 U.S. 164, 177, 112 S.Ct. 541, 116 L.Ed.2d 526 (1991) ("Although the interest in protecting the privacy of the redacted information is substantial, we must still consider the importance of the public interest in its disclosure. For unless the invasion of privacy is clearly unwarranted, the public interest in disclosure must prevail." (internal quotation marks omitted)).

¶ 39 As public officials, Mr. Floros and Ms. Swensen cannot reasonably argue that release of the investigative report would generally constitute a significant invasion of their personal privacy. The accusations of misconduct contained in the investigative report primarily pertain to the performance of their official duties.

¶ 40 The investigative report certainly contains personal information that does not relate to official conduct, including details of the origin and development of the relationship between Ms. Rice and Mr. Floros. The release of this information may well be invasive and even embarrassing. In our judgment, however, the disclosure of this information to the public will likely provide relevant context in which to fairly evaluate the propriety of the official conduct of Mr. Floros and Ms. Swensen. We therefore turn our attention to the County's assertion that the district court correctly concluded the report was a protected record under section 63–2–304(9).

B. *The Floros Investigative Report Does Not Qualify as a "Protected" Record so as to Prevent Interference with an Ongoing Investigation*

¶ 41 We are not persuaded that the Floros investigative report merits classification as protected under the provision of GRAMA that shields from public access records that "reasonably could be expected to interfere with investigations undertaken for enforcement, discipline, licensing, certification, or registration purposes[ ] . . . [or] reasonably could be expected to interfere with audits, disciplinary, or enforcement proceedings." Utah Code Ann. § 63–2–304(9)(a)–(b) (Supp.2007). We therefore part company with the district court's adoption of the County's argument that a goal of these provisions is the preservation of the integrity of future sexual harassment investigations, not just the Floros investigation, which had been completed by the time the newspaper requested the record. While the district court read GRAMA to justify restricting access to the report on this ground, we draw a different lesson from GRAMA's text.

¶ 42 Apart from section 63–2–304(9)(a), GRAMA addresses the subject of investigations in one other provision. Section 63–2–302(1)(e) classifies as "private"

> records received or generated for a Senate confirmation committee concerning character, professional competence, or physical or mental health of an individual:
>
> > (i) if prior to the meeting, the chair of the committee determines release of the records:
> >
> > > (A) reasonably could be expected to interfere with the investigation undertaken by the committee; or
> > >
> > > (B) would create a danger of depriving a person of a right to a fair proceeding or impartial hearing; and
> >
> > (ii) after the meeting, if the meeting was closed to the public.

*Id.* § 63–2–302(1)(e).

¶ 43 This section of GRAMA governing the classification of investigations conducted in connection with Senate confirmation hearings tracks closely the classification standards for investigations conducted by other governmental entities cited by the County and the district court. It is clear to us that the text of section 63–2–302(1)(e) contemplates an evaluation for potential risk of interference with the investigation at hand—"the investigation undertaken by the committee"—and not future confirmation investigations. The only way in which section 63–2–304(9)'s treatment of investigations differs from section 63–2–302(1)(e) is in its use of the plural "investigations."

¶ 44 As used in this section, "investigations" may be interpreted in two ways. When interpreted in a temporal sense, the word "investigations" imparts an intention to apply the statutory provision to investigations of the same type conducted in the future. This is the County's preferred interpretation and the one that the district court adopted. We find this interpretation to be in conflict, however, with the unambiguous language of section 63–2–302(1)(e) that limits application of record disclosure to the particular investigation to which the record relates. We adopt, therefore, the second and correct interpretation of "investigations," one that

limits the possibility of interference to a then ongoing investigation undertaken for one of the five named purposes. It is the need to account for these multiple purposes for investigations that the plural form is used, not multiple future investigations.

¶ 45 Our textual interpretation is consistent with that of courts that have confronted and turned back identical alternate readings of "investigations" provisions. The clearest expression of the low regard in which the County's interpretation of the "investigations" is held appears in *Badran v. United States Department of Justice*, 652 F.Supp. 1437 (N.D.Ill.1987), a case brought under the Freedom of Information Act. There, the district court rejected as "bewildering and indefensible" the government's efforts to restrict a woman's access to the documents in her immigration file because production might interfere with enforcement proceedings "against a person who might some day violate immigration laws." *Id.* at 1440. As the court reasoned,

> An agency may not assert the "enforcement proceedings" exception to the FOIA [under 5 U.S.C. § 552(b)(7)(A) ] "when there is no enforcement proceeding then pending or contemplated." No court has ever held to the contrary. If an agency could withhold information whenever it could imagine circumstances where the information might have some bearing on some hypothetical enforcement proceeding, the FOIA would be meaningless; all information could fall into that category.

*Id.* (citations omitted) (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 870 (D.C.Cir.1980)).

¶ 46 Having been stripped of the statutory justifications advanced by the County and accepted by the district court for classifying the Floros investigation report as nonpublic, the report has acquired a public classification by default. Although we could end our inquiry at this point, we take time to note that the report earned its public status not solely because it did not meet the stated grounds for nonpublic designation but also because of the presence of significant, legitimate public interests favoring its disclosure. We now turn our attention to them.

## V. THE PUBLIC INTEREST IS BEST SERVED BY DISCLOSING THE FLOROS INVESTIGATIVE REPORT

 ¶ 47 The Floros investigative report includes detailed findings concerning Mr. Floros's inappropriate sexual behavior. The contents of the report also fairly communicate to the objective reader, albeit by inference, a genuine question about the propriety of the manner in which Salt Lake County officials monitored their workplace and responded to evidence of sexual misconduct. We agree with the Deseret Morning News that the investigative report provides a window, opaque as that window may be, into the conduct of public officials that is not available by other means, including the summary report.

¶ 48 Cases from other jurisdictions lend support to the conclusion that the legitimate public interest in information regarding a public official's misconduct may outweigh the official's interest in preserving personal privacy. In *Local 2489, AFSCME v. Rock County*, 2004 WI App 210, 277 Wis.2d 208, 689 N.W.2d 644, thirteen employees of the Rock County Sheriff's Office, who were disciplined for viewing "inappropriate images" on work computers, sought to prevent the release of "copies of reports generated by . . . [the] investigations." *Id.* ¶ 5. The employees argued that the Janesville Gazette should be denied access to the records, in part, because the public interest in "protecting the privacy and reputations of the employees" outweighed the public interest in disclosure. *Id.* ¶ 27.

¶ 49 Although Wisconsin's records access statute is different from ours, we find the Wisconsin court's discussion of the privacy rights of public employees useful. The court said, "[Though] the public's interest in not injuring the reputations of public employees must be given due consideration, . . . it is not controlling. When individuals become public employees, they necessarily give up certain privacy rights and are subject to a degree of public scrutiny." *Id.* ¶ 26. This is especially true when the "misconduct . . . 'allegedly occurred in the location where the public has

entrusted [the employees] to work and during the performance of [their] public duties, and therefore should be more subject to public scrutiny.'" *Id.* ¶ 27 (quoting *Linzmeyer v. Forcey,* 2002 WI 84, ¶ 28, 254 Wis.2d 306, 646 N.W.2d 811 (alterations in original)). The Wisconsin court rejected efforts to keep the records private. It ordered the release of the records with the proviso that the names of the disciplined employees be redacted. *Id.* ¶ 27.

¶ 50 The Montana Supreme Court reached a similar conclusion in a case that involved allegations of sexual harassment and discrimination by a city mayor. *Citizens to Recall Mayor James Whitlock v. Whitlock,* 255 Mont. 517, 844 P.2d 74 (1992). Although we note that the court considered the case in the context of Montana's constitutional right to privacy rather than a records access statute, we find the facts and larger policy considerations helpful.

¶ 51 The city retained an independent investigator to prepare a report about the mayor for the city council following allegations of the mayor's misconduct. *Id.* at 76. After a group of citizens sought release of the report, the council refused to do so because the mayor had invoked his right to privacy. *Id.* The Montana court disagreed and held that the citizens group should be able to access the report. *Id.* at 79. The court concluded that the mayor's expectation of personal privacy with regard to the report was unreasonable because he

> is an elected official and as such is properly subject to public scrutiny in the performance of his duties.... When a person is elected to public office, the general public has ... [the] right to be informed of the actions and conduct of their elected officials.... [T]he sexual harassment allegations against [the mayor] go directly to the mayor's, and another government official's, abilities to properly carry out their duties. Information related to the ability to perform public duties should not be withheld from public scrutiny.
>
> ....
>
> ... [P]ublic officials cannot reasonably have as great an expectation of privacy as individuals who are not public servants.

*Id.* at 77–78. Moreover, the court concluded that "society will not permit complete privacy and unaccountability when an elected official is accused of sexually harassing public employees or of other misconduct related to the performance of his official duties." *Id.* at 78.

¶ 52 Like Montana and Wisconsin, we believe that the public interest in governmental accountability will often prevail over the interest of insulating an official from unwanted intrusion into sexually related conduct. The legitimate public interest in the release of the Floros investigative report provides a separate and significant basis for releasing it.

## CONCLUSION

¶ 53 We conclude that government records are presumptively public under GRAMA, and thus, the County bears the burden of proving that it properly classified the investigative report as nonpublic. We hold that the County did not properly classify the investigative report as a private record under section 63–2–302(2)(d) because the public interest in the record's release outweighs the potential personal privacy intrusion suffered. We further hold that the County did not properly classify the investigative report as a protected record under section 63–2–304(9), an exception that should properly extend only to reasonably expected investigations rather than hypothetical ones. Finally, we find legitimate public interest in releasing the report. Reversed and remanded.

¶ 54 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice DURRANT, and Justice PARRISH concur in Justice NEHRING'S opinion.