# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2013
No. 13-1228-cv

JOHN COOK,
*Plaintiff-Appellant,*

*v.*

NATIONAL ARCHIVES & RECORDS ADMINISTRATION,
*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of New York.
No. 11-cv-8624 — Kevin T. Duffy, *Judge.*

ARGUED: MARCH 10, 2014
DECIDED: JULY 8, 2014

Before: LEVAL, POOLER, and CHIN, *Circuit Judges.*

Appeal from a judgment of the United States District Court
for the Southern District of New York (Kevin T. Duffy, *Judge*)

dismissing plaintiff-appellant's complaint under the Freedom of Information Act, 5 U.S.C. § 552.  Plaintiff-appellant sought from the National Archives records relating to requests for archived materials made by or on behalf of a former President and Vice-President of the United States.  The district court granted summary judgment to defendant-appellee National Archives and Records Administration, concluding that the records fell within Exemption 6 of the statute.

     **AFFIRMED**.

---

MAXWELL S. MISHKIN, Law Student (David A. Schulz, Supervising Attorney, and Joshua S. Weinger, Law Student, *on the brief*), Media Freedom & Information Access Clinic, Yale Law School, New Haven, Connecticut, and Charles S. Sims, Proskauer Rose LLP, New York, NY, *for Plaintiff-Appellant*.[1]

DAVID S. JONES, Assistant United States Attorney (Benjamin H. Torrance, Assistant United States Attorney, *on the brief*), *for* Preet Bharara, United States Attorney for the Southern District of New York, New York, NY, *for Defendant-Appellee*.

---

CHIN, *Circuit Judge*:

     Plaintiff-appellant John Cook, a reporter, brought suit under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, seeking

---

[1] The law students appeared in this Court pursuant to Local Rule 46.1(e).

disclosure of records held by defendant-appellee the National Archives and Records Administration ("NARA"). Cook seeks to obtain records of requests for archived presidential and vice-presidential materials submitted to NARA by or on behalf of former President George W. Bush and former Vice-President Richard B. Cheney. The principal issue presented is whether the records fall within FOIA's Exemption 6, which permits the withholding of "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). The district court (Kevin T. Duffy, *Judge*) granted summary judgment to NARA, holding that Exemption 6 applies.

We conclude that the records are protected by Exemption 6. Archivists and librarians have long refrained from disclosing information about who requests materials from their collections and what materials they are seeking, without the requesting party's consent. These requests of the former President and Vice-President at issue here, made for purposes of their private research, perhaps for preparation of memoirs, reveal their preliminary thinking and personal matters. The disclosure of this information would indeed "constitute a clearly unwarranted invasion of personal privacy." Accordingly, we affirm.

## BACKGROUND

### I. NARA's Maintenance of Presidential Records

In passing the Presidential Records Act of 1978 (the "PRA"), Congress made presidential and vice-presidential records the property of the United States, ending the historic practice of presidents taking ownership of records created during their administrations. 44 U.S.C. § 2202; *see Nixon v. United States*, 978 F.2d 1269, 1277 n.19, 1284 (D.C. Cir. 1992). Under the PRA, "Presidential records" include:

> documentary materials, or any reasonably segregable portion thereof, created or received by the President, his immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise and assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President.

44 U.S.C. § 2201(2). The PRA entrusts these presidential records to NARA. *Id.* § 2203(f). Vice-presidential records are treated similarly. *Id.* § 2207.

Former President Bush's records are housed at the NARA-controlled George W. Bush Presidential Library in Dallas, Texas, and former Vice-President Cheney's at NARA's Washington, D.C.

archives. Like the other historical records it maintains, NARA makes these records available to the public for research. *Id.* § 2203(f)(1); 36 C.F.R. § 1254.1(b).

There are limits on access. Presidential and vice-presidential records are not publicly available during a period of up to five years while NARA processes and organizes records it receives. 44 U.S.C. § 2204(b)(2)(A)-(B). Before leaving office, a president or vice-president may also designate a period of up to twelve years during which certain records will be unavailable to the public. *Id.* § 2204(a).

During periods when the records are not yet available to the public, former presidents and vice-presidents, or their designated representatives, may access the archived records of their respective administrations by submitting special access requests. *Id.* § 2205(3). The incumbent president, the judiciary, and Congress may also request archived records of prior administrations, but only in connection with their official duties. *Id.* § 2205(2). At the Bush Library, once special access requests are received -- often by email and sometimes orally -- a paper folder is created reflecting the request. The requests "are logged by date of receipt, and reveal the identity of the specific requestor (an authorized representative of former President George W. Bush) and the specific item or information sought." J.A. at 113-14 ¶ 16.

NARA maintains that it treats the special access requests received from former officials or their representatives "in a manner wholly consistent with how [it] handle[s] typical researcher requests in terms of the privacy and confidentiality afforded to any requestors." *Id.* at 115 ¶ 21. As set forth in its staff manual, NARA's general policy on the disclosure of researcher requests is as follows: "Unless required by law, staff members will not reveal the subject of a researcher's project or the specific items provided to a researcher without the express consent of the researcher." *Id.* at 116 ¶ 21.

**II.     Cook's FOIA Request and NARA's Response**

By letter dated October 21, 2010, Cook submitted a FOIA request to NARA seeking: (1) "copies of all requests for access to records received by the [Bush Library] since February 1, 2009"; (2) "copies of all requests for access to the records of former Vice-President Dick Cheney received by NARA staff since February 1, 2009"; and (3) "any subsequent correspondence regarding those requests, with the exclusion of copies of records governed by the [PRA]." *Id.* at 19. Cook did not seek the Bush/Cheney records themselves; he only sought NARA's documentation of the requests for the records. His stated purpose for seeking these records was "to gain insight into the way in which the former President and Vice

President have chosen to shape the public's perception of their time in office." J.A. at 8 ¶ 5.

NARA responded by letter dated December 1, 2010. The agency explained that requests for access to the Bush/Cheney records came in the form of either (a) special access requests submitted by current and former officials or (b) public FOIA requests. First, with respect to the special access requests, the agency stated: "[NARA] treats these requests as researcher reference requests. . . . These records include but are not limited to the following categories: correspondence between NARA staff and researchers containing information about the research topic(s), field(s) of interest, identification of requested records, and other information furnished by the researcher." J.A. at 22. The agency further informed Cook that, because it protects the privacy of researchers, it would withhold the records of the special access requests under FOIA's Exemption 6.

Second, with respect to Cook's FOIA demand for public FOIA requests, NARA indicated that "FOIA requesters are not subject to the same right to privacy as . . . researchers." *Id.* at 23. Thus, the

agency made available to Cook redacted copies of all such FOIA requests, as well as its responses to those requests.[2]

Cook filed an administrative appeal by letter dated January 3, 2011, protesting NARA's decision to withhold the records of the special access requests. In response, NARA amended its initial decision by letter dated June 3, 2011. The agency distinguished special access requests submitted by the former officials (former President Bush, former Vice-President Cheney, and their designated representatives) from special access requests submitted by current officials (the incumbent President, Congress, and the judiciary). NARA deemed the former officials' special access requests to be "researcher reference requests that have been made [by or] on behalf of private citizens" and thus properly withheld under Exemption 6. *Id.* at 32. In contrast, NARA deemed the current officials' special access requests to be in furtherance of "official business" and thus not entitled to protection as private researcher reference requests.

---

[2] Cook's FOIA request also sought "[a]ny agreements or memoranda of understanding between the [Bush Library] and any researchers, scholars, former government officials, or any other entities governing current or future access to records maintained by the Library." J.A. at 19. The agency, however, found no responsive records.

*Id.* Accordingly, Cook was permitted access to the current officials' requests, but not the former officials' requests.

Cook filed suit in the district court to challenge NARA's failure to produce the records he requested. The only issue on appeal is NARA's decision with respect to the special access requests of the former officials.

### III. Proceedings Before the District Court

In the district court, the parties agreed to narrow Cook's FOIA request to (a) records of the special access requests submitted by former President Bush, former Vice-President Cheney, or their designated representatives; (b) NARA's written responses to the requests; and (c) internal NARA documents memorializing requests that were not in writing. NARA identified 907 such records from the Bush records and 61 from the Cheney records.

NARA maintained that the narrowed records Cook sought were exempt from disclosure under Exemption 6, while retaining the right to assert that other FOIA exemptions apply to certain content within the records. The parties thereafter stipulated that "NARA first will file a motion for summary judgment asserting whatever exemptions NARA contends may properly be asserted on a categorical basis, meaning legal reasons that NARA asserts apply equally to all documents at issue in this action, and to the entirety of

each such document." *Id.* at 51. They further agreed that if the motion did not resolve the suit in its entirety, NARA would then "be entitled to assert whatever exemptions it contends apply on a non-categorical basis in a second, subsequent motion." *Id.*

NARA moved for summary judgment asserting Exemption 6 categorically. The district court determined that the records Cook seeks are "similar files" for purposes of Exemption 6 because they reveal detailed information about the former officials -- the identity of the official who sought information from NARA and what information was sought. *Cook v. Nat'l Archives & Records Admin.*, 921 F. Supp. 2d 148, 155-56 (S.D.N.Y. 2013). The district court then concluded that, given the former officials' privacy interest in their research inquiries and the minimal public interest involved, disclosure would amount to an unwarranted invasion of personal privacy. *Id.* at 156-57. Consequently, the district court granted summary judgment to NARA. *Id.* at 157-58.

This appeal followed.

## DISCUSSION

We review *de novo* a district court's summary judgment decision in a FOIA case. *Wood v. F.B.I.*, 432 F.3d 78, 82 (2d Cir. 2005).

Congress enacted FOIA "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny."

*U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991) (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976)).  Thus, FOIA mandates the public disclosure of records of federal agencies upon request, unless one of nine statutory exemptions applies.  5 U.S.C. § 552(a), (b)(1)-(9); *Wood*, 432 F.3d at 82-83.  Because FOIA manifests a "strong presumption in favor of disclosure," *Ray*, 502 U.S. at 173, we construe FOIA exemptions narrowly, resolving doubts in favor of disclosure and imposing on the government the burden of showing that an asserted exemption indeed applies.  *Wood*, 432 F.3d at 83; *Perlman v. U.S. Dep't of Justice*, 312 F.3d 100, 105 (2d Cir. 2002), *vacated*, 541 U.S. 970 (2004), *reaffirmed*, 380 F.3d 110 (2d Cir. 2004).

On appeal, Cook argues that NARA's assertion of Exemption 6 is not well-founded and, alternatively, that NARA should be compelled to segregate any portions of the records that may fall under Exemption 6.  We address the applicability of Exemption 6 and the segregability of the records in turn.

## I.     Exemption 6

FOIA's Exemption 6 permits the withholding of "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).  We employ a two-prong inquiry in deciding whether the government has correctly withheld records under

Exemption 6. First, we determine whether the records in question are "personnel," "medical," or "similar" files. *Associated Press v. U.S. Dep't of Def.*, 554 F.3d 274, 291 (2d Cir. 2009); *Wood*, 432 F.3d at 86. Second, if so, we then "balance the public need for the information against the individual's privacy interest in order to assess whether disclosure would constitute a clearly unwarranted invasion of personal privacy." *Associated Press*, 554 F.3d at 291.

A. **"Personnel and Medical Files and Similar Files"**

NARA maintains that the records of the former officials' requests for archived materials are "similar files." We agree.

The phrase "similar files" sweeps broadly and has been interpreted by the Supreme Court to mean "detailed Government records on an individual which can be identified as applying to that individual." *U.S. Dep't of State v. Washington Post Co.*, 456 U.S. 595, 602 (1982) (internal quotation marks omitted); *see also Ray*, 502 U.S. at 173; *Associated Press*, 554 F.3d at 291; *Perlman*, 312 F.3d at 106. The Supreme Court noted that it would be anomalous for information about a person to be protected by Exemption 6 because it was found in a "medical" or "personnel" file, but lose protection if it happened to be found in another file. *See Washington Post*, 456 U.S. at 601 ("[T]he protection of an individual's right of privacy[,] which Congress sought to achieve by preventing the disclosure of

[information] which might harm the individual, surely was not intended to turn upon the label of the file which contains the damaging information." (internal quotation marks and citation omitted) (first and third alterations in original)).

The Court in *Washington Post* also specifically rejected the notion that only files containing "intimate details" and "highly personal" information could qualify as "similar files." *Id.* at 600. As the Court pointed out, "'personnel and medical files,' the two benchmarks for measuring the term 'similar files,' are likely to contain much information about a particular individual that is not intimate," such as place and date of birth, date of marriage, and employment status. *Id.*

The case law also makes clear that to qualify as a "similar file" under Exemption 6, a record need not be like a personnel file in the sense that it is employment-related or a medical file in the sense that it contains a record of a person's medical history or medical treatment and care. Indeed, the record need not even be a "file." Hence, the following types of records have been deemed to be "similar files" for purposes of Exemption 6: Passport Office records

revealing citizenship status;[3] an investigation report revealing alleged misconduct;[4] letters to Guantanamo Bay detainees revealing the names and addresses of family members;[5] and records of interviews of deported aliens revealing their identities.[6]

Accordingly, a record is a "similar file" if it contains personal information identifiable to a particular person. *Washington Post*, 456 U.S. at 599-602; *Associated Press*, 554 F.3d at 291.[7] As the Court noted in *Washington Post*, "Congress' primary purpose in enacting Exemption 6 was to protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information." *Id.* at 599.

We conclude that the records Cook seeks are "similar files," as they contain detailed records containing personal information identifiable to the former officials and their representatives. Cook

---

[3] *Washington Post*, 456 U.S. at 602.

[4] *Perlman*, 312 F.3d at 106.

[5] *Associated Press*, 554 F.3d at 291.

[6] *Ray*, 502 U.S. at 173.

[7] To be sure, this interpretation of "similar files" does not mean that the phrase has no limits, as "[i]nformation unrelated to any particular person presumably would not satisfy the threshold [similar files] test." *Washington Post*, 456 U.S. at 602 n.4.

seeks records that show what specific archived materials were sought by former President Bush and former Vice-President Cheney and their representatives. The approximately one thousand records identified by NARA "reveal the identity of the specific requestor," J.A. at 113 ¶ 16, and include "correspondence between NARA staff and researchers containing information about the research topic(s), field(s) of interest, identification of requested records, and other information furnished by the researcher," *id.* at 22. Because they reveal what archived materials were sought from NARA, who sought those materials, and the general research topics and fields of interest of particular requestors, the records Cook seeks contain information about specific persons that can be identified as applying to those persons and are therefore "similar files."

Cook insists that, by taking advantage of the PRA's grant of early access to publicly unavailable records, the former officials have "voluntarily engage[d] with the government to receive some benefit or privilege" and are thus less entitled to the protection of Exemption 6. Appellant's Br. at 17. For this proposition, Cook cites *News-Press v. U.S. Dep't of Homeland Sec.*, 489 F.3d 1173 (11th Cir. 2007), and *Elec. Frontier Found. v. Office Dir. of Nat'l Intelligence*, 639 F.3d 876 (9th Cir. 2010). To the extent that the former officials and their representatives may have voluntarily engaged with the

government to receive benefits or privileges, that fact only enters into the Exemption 6 calculus when deciding how to balance their privacy interest against the public interest in disclosure; it is not relevant to the threshold question of whether the records are "similar files." *See News-Press*, 489 F.3d at 1202; *Elec. Frontier*, 639 F.3d at 886-87.

B.    "**Clearly Unwarranted Invasion of Privacy**"

We now consider whether disclosure of the records would amount to an unwarranted invasion of privacy, the "crux" of the Exemption 6 inquiry. *News-Press*, 489 F.3d at 1197. In doing so, we weigh the privacy interests of the former officials in the records against the public interest in "opening agency action to the light of public scrutiny." *Associated Press*, 554 F.3d at 291.

1.    **Privacy Interest**

"'The balancing analysis for FOIA Exemption 6 requires that we first determine whether disclosure of the files would compromise a substantial, as opposed to *de minimis*, privacy interest, because if no significant privacy interest is implicated FOIA demands disclosure.'" *Long v. Office of Pers. Mgmt.*, 692 F.3d 185, 191 (2d Cir. 2012) (quoting *Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1229 (D.C. Cir. 2008)); *accord Associated Press*, 554 F.3d at 286; *Fed. Labor Relations Auth. v. U.S. Dep't of Veterans Affairs*, 958 F.2d

503, 510 (2d Cir. 1992). Furthermore, the Supreme Court teaches that "both the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person." *U.S. Dep't of Justice v. Reporters Comm. For Freedom of the Press*, 489 U.S. 749, 763 (1989); *see also id.* at 765 (recognizing privacy interest in FBI "rap sheet").[8] Thus, "regardless of the nature of the information contained in them, disclosure of records containing personal details about private citizens can infringe significant privacy interests." *Veterans Affairs*, 958 F.2d at 510 (internal quotation marks omitted).

We are persuaded that the former officials have more than a *de minimis* privacy interest in the nondisclosure of their requests for archived materials. Information about what archived materials the former officials requested from NARA would reveal personal details -- what they were thinking, considering, and planning as they

---

[8] *Reporters Committee* interpreted Exemption 7, which permits the withholding of records gathered for law enforcement purposes where disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7). Although Exemption 7 affords a greater degree of privacy protection than Exemption 6,"the sort of privacy interest that must first be shown before protection is afforded" is the same for both exemptions. *Fed. Labor Relations Auth. v. U.S. Dep't of Veterans Affairs*, 958 F.2d 503, 509 (2d Cir. 1992). *Reporters Committee*'s discussion of privacy therefore informs the analysis under Exemption 6 as well. *See id.* at 510.

transitioned back to private life after their years of service to the country. The implicated privacy interests are compelling. The former officials have a significant interest in developing their ideas privately, free from unwanted public scrutiny. There are compelling reasons to include within the privacy protection established by Exemption 6 the subjects of a person's research and intellectual inquiry, lest such activity be chilled. *See United States v. Rumely*, 345 U.S. 41, 57 (1953) ("When the light of publicity may reach any student, any teacher, inquiry will be discouraged.") (Douglas, *J.*, concurring).

In addition, the confidential nature of research requests is well-recognized. All fifty states and the District of Columbia protect the confidentiality of the records of a person's use of public library materials.[9] Similarly, the "Code of Ethics for Archivists" approved by the Society of American Archivists commands archivists to "respect all users' rights to privacy by maintaining the confidentiality of their research and protecting any personal

---

[9] *See, e.g.*, Cal. Gov't Code § 6267 (West 2008 & Supp. 2013) (California); Conn. Gen. Stat. § 11-25 (2001) (Connecticut); D.C. Code § 39-108 (2002) (District of Columbia); Fla. Stat. § 257.261 (2002) (Florida); N.H. Rev. Stat. Ann. § 91-A:5 (2002) (New Hampshire); N.J. Stat. Ann. § 18A:73-43.2 (West 2002) (New Jersey); N.Y. C.P.L.R. § 4509 (McKinney 2002) (New York); 24 Pa. Cons. Stat. § 9375 (2002) (Pennsylvania); Vt. Stat. Ann. tit. 1, § 317(c)(19) (2001) (Vermont).

information collected about the users."[10]  Likewise, the "Code of
Ethics" of the American Library Association recognizes "each library
user's right to privacy and confidentiality with respect to
information sought or received and resources consulted, borrowed,
acquired or transmitted."[11]

Cook argues that the privacy interests of the former officials
are entitled to only diminished protection because they are "quasi-
governmental actors" who continue to receive governmental salaries
and secret service protection and are granted special access to the
records before they become publicly available.  We are not
persuaded.  An individual does not lose her right to privacy merely
because she once served the government in an official capacity or
because she receives benefits from the government, such as secret
service protection (in recognition of the continued danger to her
personal safety incurred as a result of her former government
service).  Moreover, the balance struck by the PRA and its interplay
with FOIA would be undermined if we were to hold that the former
officials were not entitled to the full protection of Exemption 6 on

---

[10] http://www2.archivists.org/statements/saa-core-values-statement-and-code-of-ethics#code_of_ethics, (last visited July 1, 2014).

[11] http://www.ala.org/advocacy/proethics/codeofethics/codeethics, (last visited July 1, 2014).

the theory that they enjoyed only a "diminished" privacy interest. We must keep the historical context in mind: before the passage of the PRA, the President's papers were his property after he left office, and he was free to consult his papers at will, completely privately. The PRA gives no indication that Congress intended to alter the President's historically unfettered access to his papers by, for example, making his requests to access them subject to public disclosure.  Indeed, the President and his designated representatives are the only persons afforded unrestricted access to these records under the PRA.  *See* 44 U.S.C. § 2205(3).

### 2.    **Public Interest**

The public does have an interest, of course, in accessing government documents "to pierce the veil of administrative secrecy" and to open agency action to "public scrutiny."  *Rose*, 425 U.S. at 361. Hence, we must consider "the extent to which disclosure would serve the 'core purpose of the FOIA,' which is 'contribut[ing] significantly to public understanding *of the operations or activities of the government*."  *U.S. Dep't of Def. v. Fed. Labor Relations Auth.*, 510 U.S. 487, 495 (1994) (emphasis and alteration in original) (quoting *Reporters Committee*, 489 U.S. at 775).  Indeed, "[g]oals other than opening agency action to public scrutiny are deemed unfit to be

accommodated under FOIA when they clash with privacy rights."
*Veterans Affairs*, 958 F.2d at 510-11.

The public interests asserted by Cook do not justify the substantial intrusion into the former officials' privacy. First, Cook insists that

> [d]isclosure of the special access requests --
> including the identities of the requesters and the
> description of the records sought -- would enable
> the public to assess the relationship between
> powerful, quasi-governmental Former Officials
> and an independent agency that may not have
> aligning interests. In this way, seeing how NARA
> responds to special access requests provides the
> public with insight into "what their government
> is up to."

Appellant's Br. at 37 (quoting *Reporters Committee*, 489 U.S. at 773).
We are unpersuaded. While information as to how NARA responds to special access requests submitted by the former officials may shed some light on the internal functioning of the agency, knowledge of what *specific* information was sought and by whom sheds little light on how NARA is carrying out its obligations.

Second, Cook argues that "disclosure will show the extent to which the special access given to former officials . . . is actually being used to facilitate the preparation of memoirs as Congress intended, or for other purposes (e.g., the continued waging of political

battles)." Appellant's Reply Br. at 14. Although the PRA's legislative history does indeed suggest that early access was granted to former officials to facilitate the writing of memoirs, Cook cites nothing in the statute limiting how the former officials may use the records they receive from NARA. Indeed, the statute expressly gives the former officials unrestrained access to their presidential and vice-presidential records. 44 U.S.C. § 2205(3) ("[T]he Presidential records of a former President shall be available to such former President or his designated representative."). It is therefore not NARA's duty to police how the former officials use the presidential records they receive. In light of this, disclosure of the former officials' requests for records would do little to advance the public understanding of how NARA is carrying out *its* duties.

In sum, we conclude that the former officials' compelling privacy interests outweigh any public interest in disclosure.

## II.     Segregability of the Records

We also reject Cook's alternative argument that NARA should be compelled to redact the specific portions of the records that fall under Exemption 6.

In light of the stipulations entered into by NARA and Cook, and Cook's failure in opposing summary judgment to argue segregability, that issue is not properly before us. The parties agreed

to litigate only exemptions that apply on a categorical basis to "all documents at issue in this action, and to the entirety of each such document." J.A. at 51 ¶ 1. Thus, the only issue before the district court was whether Exemption 6 applied to *all* the records Cook sought. NARA expressly reserved the right to litigate exemptions that apply to some of the records on a non-categorical basis, if its motion did not "result in a final judgment for NARA dismissing the complaint in its entirety." *Id.* at 51 ¶ 2. NARA's motion did result in the dismissal of the entire complaint, however, and the district court did not address the issue of segregability as Cook did not raise the issue. In light of these circumstances, there is no reason for us to reach the question now.

In any event, segregation would produce little of value here. FOIA expressly authorizes the redaction of records to prevent an invasion of privacy, given that "the policy of informing the public about the operation of its Government can be adequately served in some cases without unnecessarily compromising individual interests in privacy." *Ray*, 502 U.S. at 174. "[A] court may [however] decline to order an agency to commit significant time and resources to the separation of disjointed words, phrases, or even sentences which taken separately or together have minimal or no information

content." *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 261 n.55 (D.C. Cir. 1977).

If we were to order NARA to redact the offending information -- descriptions of which officials (or their representatives) sought records, what records they sought, and any NARA response that might reveal such information -- very little would be left of the records of the special access requests. Compelling NARA to undertake the review and redaction of almost one thousand records to produce little of value would be a waste of time and resources. We decline to compel NARA to engage in this exercise.

## CONCLUSION

The judgment of the district court is **AFFIRMED**.