WATFORD, Circuit Judge,
dissenting:
The Department of Defense has shown that the Western Hemisphere Institute for Security Cooperation’s foreign students and instructors have a non-trivial privacy interest in keeping their identities secret. Disclosing their n§mes to the public would reveal their affiliation with the Institute, which might expose them to the risk of harassment or violence when they return to their home countries. But the question remains under Exemption 6 of the Freedom of Information Act (FOIA) whether that invasion of privacy would be “clearly unwarranted.” 5 U.S.C. § 552(b)(6). To answer that question, we must balance the privacy interests at stake against the public interest in disclosure protected by FOIA—namely, “the citizens’ right to be informed about ‘what their government is up to,’ ” which encompasses “[o]fficial information that sheds light on an agency’s performance of its statutory duties.” Department of Justice v. Reporters Committee for Freedom of the Press, 489 U.S. 749, 773, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989). In my view, on the thin evidentiary record presented here, the Department of Defense did not carry its burden of demonstrating that the students’ and instructors’ privacy interests outweigh the strong public interest in disclosure of their names.
I
Let’s start with the public interest in disclosure, which requires a little bit of-background. The Institute is operated by the Army at Fort Benning, Georgia. It was established in 2001, but it is actually a continuation of the School of the Americas (SOA), which' opened its doors under a different name in 1946 and moved to Fort Benning in the 1980s. SOA became the subject of considerable controversy after the 1989 massacre of six Jesuit priests in El Salvador during that country’s civil war. It turned out that 19 of the soldiers involved in the massacre had received training at SOA.
That incident was not an anomaly. After the Army began releasing the names of former SOA students and instructors in 1994 as a result of FOIA requests, human rights activists linked the school’s attendees to a host of notorious crimes. A few examples: SOA graduates were implicated in additional atrocities committed during the civil war in El Salvador, including the assassination of Archbishop Oscar Romero, the execution of four American church *647 women, and the massacre of hundreds of civilians in the village of El Mozote. A Guatemalan colonel who attended SOA was accused of murdering, six months after graduating, an American innkeeper in Guatemala in 1990. Six Peruvian SOA graduates were connected to the killings of nine students and a professor in Peru in 1992. In addition, SOA counted among its alumni Salvadoran death-squad leader Roberto D’Aubuisson; Bolivian strongman Hugo Banzer Suarez; Panamanian dictator and convicted drug-trafficker Manuel Noriega; Argentine dictators and “dirty war” culprits Roberto Viola and Leopoldo Galti-eri; and Ecuador’s Guillermo Rodriguez and Peru’s Juan Velasco Alvarado, both of whom toppled democratically elected governments. See H.R. 732, 106th Cong. (1999); Richard F. Grimmett & Mark P. Sullivan, Congressional Research Service, U.S. Army School of the Americas: Background and Congressional Concerns 3-4 (2001); Eric Schmitt, School for Assassins, or Aid to Latin Democracy?, N.Y. Times, Apr. 3,1995, at A8.
The Army cautioned, rightly, that these incidents were not representative of the vast majority of SOA attendees, although it did not disclaim them entirely. A spokesman for the school responded to the criticism in 1995 by observing that “[o]ut of 59,000 students who have graduated from a variety of programs, less than 300 have been cited for human rights violations like torture and murder, and less than 50 have been convicted of anything.” Schmitt, School for Assassins, at A8. However, the controversy escalated in 1996 when the Pentagon released excerpts of training manuals previously used at SOA that provided instruction on torturing and executing insurgents. See Dana Priest, U.S. Instructed Latins on Executions, Torture, Wash. Post, Sept. 21,1996, at Al.
In 1997, Congress began imposing legislative restrictions on the school’s operations. It enacted what became known as the Leahy Amendment, which barred the military from assisting any foreign security unit credibly believed to have committed human rights abuses unless that unit’s government had taken steps to bring the responsible parties to justice. See Foreign Operations, Export Financing, and Related Programs Appropriations Act for Fiscal Year 1998, Pub. L. No. 105-118, § 570, 111 Stat. 2386, 2429 (1997). Congress also barred funding for SOA unless the Secretary of Defense certified that the training provided at the school was consistent with that provided to U.S. personnel at other military institutions, “particularly with respect to the observance of human rights.” Id. at 2401. The intended effect of these provisions was to preclude Latin American military and law-enforcement personnel from attending SOA if their units had engaged in past human rights abuses, and to ensure that the school’s attendees were not trained in ways that might contribute to human rights abuses after they returned to their home countries. The Leahy Amendment and the certification requirement did not quiet the outcry over SOA. In 1999, the House of Representatives passed an amendment by a vote of 230-197 that would have closed SOA altogether. See 145 Cong. Rec. 18716-26,18737 (1999).
In response to this congressional action, the Army pledged curricular changes and increased civilian participation at the school, and these proposed changes succeeded in staving off the school’s closure. In 2000, rather than close SOA, Congress decided to impose reform measures. Congress required the school to include instruction for all students on respect for human rights and principles of democratic -governance, and mandated oversight of the school by a Board of Visitors composed primarily of civilians and cmlian-desig- *648 nees. See National Defense Authorization Act for Fiscal Year 2001, Pub. L. No. 106-398, § 911, 114 Stat. 1654, 1654A-226-28 (2000) (codified at 10 U.S.C. § 2166). To avoid association with SOA’s controversial past, it was thought best to rename the school going forward. Beginning in early 2001, the school began operating under its new name: the Western Hemisphere Institute for Security Cooperation.
That background is relevant to understanding the strength of the public interest in disclosure involved here. Disclosing the names of the Institute’s foreign students and instructors is necessary to allow citizens to remain informed about “what their government is up to.” For example, without the names, the public has no way of determining whether the issues that led to the school’s near closure have been adequately addressed. Is the Army in fact barring attendance of foreign military and law-enforcement personnel who belong to units with records of human rights abuses? Or are such individuals continuing to receive training at the Institute at taxpayer expense? Have the new curricular requirements been effective in instilling the importance of respect for human rights and democratic values? Or are students trained at the Institute continuing to commit human rights abuses upon returning to their home countries? These are not idle questions given the school’s checkered history. Because the Institute remained in operation only after Congress mandated reforms designed to fix the problems that formerly plagued the school, the public has a strong ongoing interest in assessing whether those measures are working.
Beyond advancing this more general interest, disclosing the names of the Institute’s foreign students and instructors would also shed light on how well the Departments of Defense and State are performing their statutory duties. See Reporters Committee, 489 U.S. at 773, 109 S.Ct. 1468. Under the current version of the Leahy Amendment, the government may not train, equip, or otherwise assist any “unit” of a foreign security force if the unit has committed “a gross violation of human rights.” 10 U.S.C. § 2249e(a)(l); 22 U.S.C. § 2378d(a). This restriction imposes specific duties upon the Departments of Defense and State. The Defense Department is expressly barred from spending funds on the proscribed foreign assistance, and prior to aiding a foreign security unit, the Secretary of Defense must consult with the Secretary of State regarding “any credible information available to the Department of State relating to human rights violations by such unit.” 10 U.S.C. § 2249e(a). In turn, the Secretary of State must “ensure that when an individual is designated to receive United States training, equipment, or other types of assistance the individual’s unit is vetted as well as the individual.” 22 U.S.C. § 2378d(d)(5). Disclosure of the names of the Institute’s foreign students would allow the public to assess the State Department’s performance of its vetting functions, as well as the Defense Department’s performance of its duty to consult with the State Department and to refrain from training any units with suspect human rights records.
II
The strength of the public interest in disclosure is what distinguishes this case from the cases on which the Department of Defense relies to justify its invocation of Exemption 6. In those cases, the courts struck the balance in favor of protecting privacy interests because the public interest in disclosure was either non-existent or exceptionally weak.
In the first set of cases, there was simply no cognizable public interest in disclosure at all. See Bibles v. Oregon Natural *649 Desert Association, 519 U.S. 355, 355-56, 117 S.Ct. 795, 136 L.Ed.2d 825 (1997) (per curiam); Department of Defense v. FLRA, 510 U.S. 487, 497-98, 114 S.Ct. 1006, 127 L.Ed.2d 325 (1994); Reporters Committee, 489 U.S. at 774-75, 109 S.Ct. 1468. The requested information revealed “little or nothing” about the relevant government agencies or their activities, and therefore could not “appreciably further the citizens’ right to be informed about what their government is up to.” FLRA, 510 U.S. at 497, 114 S.Ct. 1006 (internal quotation marks omitted). For the reasons just explained, the same cannot be said about the information requested by the plaintiffs in this case.
In the second set of cases, the courts held that although a cognizable public interest in disclosure existed, it was adequately served by the wealth of information the government had already made publicly available. See Department of State v. Ray, 502 U.S. 164, 178, 112 S.Ct. 541, 116 L.Ed.2d 526 (1991); Prudential Locations LLC v. HUD, 739 F.3d 424, 433 (9th Cir. 2013) (per curiam); Forest Service Employees for Environmental Ethics v. U.S. Forest Service, 524 F.3d 1021, 1028 (9th Cir. 2008). In those cases, obtaining the additional information sought by the requesters (the names of particular individuals) would not have shed any light on the operations or activities of the government. Here, by contrast, without obtaining the foreign students’ and instructors’ names, the public cannot exercise its right to remain informed about the Army’s operation of the Institute or assess how well the Departments of State and Defense are performing their statutory duties.
The majority asserts that annual reports produced by the Institute’s Board of Visitors, as well as those issued by the Department of Defense itself, are adequate for these purposes, see Maj. op. at 643, 644, 645, but in truth the reports are utterly useless in this regard. They merely provide general conclusions about the Army’s operation of the Institute and the government’s vetting of its attendees, not the underlying information necessary to determine whether those conclusions are correct.[1] Without knowing the actual names of those allowed to attend the Institute, the public has no way of independently verifying whether students are properly vetted before enrolling at the Institute, or whether after graduating they engage in human rights abuses in their home countries. As the majority would have it, the public must simply take the government’s word for it that the reform measures mandated by Congress have been effective. This fox-guarding-the-henhouse notion is, of course, completely antithetical to FOIA’s core purpose.
Finally, in the last set of cases, the requesters alleged that, in the course of investigating an isolated incident, the government had either engaged in a cover-up or conducted an insufficiently thorough investigation. See National Archives and Records Administration v. Favish, 541 U.S. 157, 160-61, 124 S.Ct. 1570, 158 L.Ed.2d 319 (2004) (requester alleged that Vince Foster’s death was not actually a suicide); Lahr v. National Transportation Safety Board, 569 F.3d 964, 969 (9th Cir. 2009) (requester alleged that TWA Flight 800 did not crash; it was shot down by the military); Lane v. Department of the Interior, 523 F.3d 1128, 1131-33 (9th Cir. 2008) (requester alleged that her former supervisor had in fact threatened a fellow employee with a gun, contrary to the conclusion reached by investigators). In that narrow *650 context, when the asserted public interest rests on showing that “the investigative agency or other responsible officials acted negligently or otherwise improperly in the performance of their duties,” the requester must produce at least some evidence of government impropriety to substantiate the public interest claim. Favish, 541 U.S. at 173-74, 124 S.Ct. 1570.
The majority’s reliance on this last set of cases is misplaced for two reasons. First, the standard established in those cases does not apply here. The plaintiffs are not seeking materials related to the alleged mishandling of an investigation into one isolated incident, the only context in which the Supreme Court and our court have applied the Favish standard. Rather, they are seeking information relevant to assessing government activities of a programmatic nature, a context in which the Supreme Court has held that a strong public interest in disclosure exists without any showing' of government impropriety. See Department of the Air Force v. Rose, 425 U.S. 352, 368, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976). But even under the majority’s reading of Favish, the standard established in that case does not apply here because the plaintiffs are not merely seeking information about whether an agency “acted negligently or improperly in carrying out its statutory duties.” Maj. op. at 641. They are also seeking information necessary to determine whether students who attend the Institute commit human rights abuses or other misconduct after returning to their home countries. As the .majority itself acknowledges, that interest is in no way tied to the interest in monitoring whether the Departments of Defense and State are properly carrying out their statutory duties. Maj. op. at 644-45.
Second, even if the plaintiffs were required under Favish to make a threshold evidentiary showing, they have done so. The plaintiffs would merely need to establish “more than a bare suspicion” of impropriety—in other words, “evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred.” Favish, 541 U.S. at 174, 124 S.Ct. 1570. The plaintiffs have easily satisfied that standard by pointing to the troubled history of SOA, which led Congress to acknowledge a need for new vetting and oversight procedures. The majority simply ignores the relevance of this pre-2001 history. Yet it is precisely because of the problems that plagued the Institute’s predecessor that the public has such a strong interest in determining whether or not the reforms implemented to correct those problems have been effective.
Ill
What I have shown thus far, I hope, is that the public interest in disclosure is much stronger than the majority is willing to allow. But what about the privacy interests at stake? Are they strong enough to outweigh the public interest in disclosure? That depends on how grave we believe the risk of harm to the foreign students and instructors might be if their names are disclosed. Ordinarily, I would be inclined to give considerable deference to the judgment of military officials about the gravity of the risks posed by disclosure of potentially sensitive information. The reason I think we should be more skeptical here is that the military itself determined for a decade, from 1994 to 2004, that the risks of disclosure were not sufficiently compelling to justify withholding the names under Exemption 6. During this period, the Army disclosed not only the names of all foreign students and instructors who attended the Institute each year, but also the names of all foreign students and instructors who had attended the Institute *651 and its predecessor dating back to 1946— some 60,000 names in all.
It would be one thing if the Department of Defense had informed us that its risk assessment changed in 2005 because a foreign student or instructor had been targeted for harassment or violence due to his affiliation with the Institute. That would make it easy to understand the Department’s about-face. But here, the Defense Department pointed to no such event, and indeed, so far as the record discloses, none of the 60,000 individuals whose names have been publicly released has ever been the target of harassment or violence based on their having attended the Institute or its predecessor.
The Department of Defense is certainly correct in arguing that it is not required to show some past incident of harm in order to invoke Exemption 6 as a basis for nondisclosure. But in light of the history involved here, I think we are entitled to demand from the Department some explanation for why it is now saying that the risks of disclosure are too great when apparently it did not believe that to be true before. Otherwise, we are simply rubber-stamping the government’s decision.
The declarations submitted by the Department of Defense do not provide a satisfactory explanation (or frankly any explanation at all). The Department provided just two short declarations from a public affairs staffer at the Institute named Lee Rials. Attached to one of his declarations is a transcript of testimony given by two generals at a, 2010 congressional hearing devoted to other subjects during which the generals answered a single question about the Institute. (This is the congressional testimony to which the majority refers. See Maj. op. at 635-36.) The Rials declarations assert, based on “Defense Intelligence Agency assessments” which the government chose not to submit, that disclosure of the foreign students’ and instructors’ names would increase the risk of retaliation from three sources: (1) “the intelligence and security apparatuses of countries hostile to U.S. interests”; (2) “terrorist organizations operating in the Western Hemisphere”; and (3) “drug trafficking organizations operating in the Western Hemisphere.” But the risks of retaliation from these sources were undoubtedly present during the 1994-2004 time period as well. They did not just pop up beginning in 2005. Rials’ declarations offer no explanation for why the military has determined that those risks had increased sufficiently by 2005 to warrant striking a different balance between privacy interests and the public interest in disclosure.[2]
At oral argument, the government’s lawyer asserted that the terrorist attacks of September 11, 2001, caused the Department of Defense to reassess its prior policy of disclosing the names. The main problem with that explanation: It appears nowhere in the declarations the government submitted. Neither the Rials declarations nor the testimony from the two generals mentions the September 11 attacks. The government did submit a copy of a November 2001 Defense Department memo that announced, in light of the re *652 cent attacks, a new policy with respect to “DoD personnel” of withholding “lists of names and other personally identifying information.” However, Rials did not cite this memo in explaining the Department of Defense’s 2005 decision to stop disclosing the names of the Institute’s foreign students and instructors, and the government failed to offer any other declaration—let alone one from a military officer—explaining the memo’s role in the 2005 decision-making process.
The link between the November 2001 memo regarding “DoD personnel” and the Army’s 2005 decision to stop disclosing the names of foreign military personnel -attending the Institute is not so obvious that we can assume a connection without any supporting evidence. For one thing, it is not by any means clear that the memo was intended to apply to foreign students and instructors at a U.S. military training school; the memo’s focus appears to be on protecting the identities of U.S. military personnel, who would be obvious targets for attack in the wake of September 11. Had the memo also been intended to cover foreign students and instructors at the Institute, it is inconceivable that the Army would have continued to disclose their names in response to FOIA requests for more than three years after the memo’s issuance, which is what happened here. For another thing, the November 2001 memo relied on an Exemption 6 balancing analysis (under which privacy interests were deemed to prevail), but that analysis is quite different for the two groups of personnel. The public interest in knowing which foreign students our government chooses to train militarily and what comes ^ of that training is much stronger than any public interest that might exist in the disclosure of the identities of U.S. military personnel.
[[Image here]]
Under FOIA, Congress has established a “strong presumption in favor of disclosure,” and it has placed “the burden on the agency to justify the withholding of any requested documents.” Ray, 502 U.S. at 173, 112 S.Ct. 541. Had the government provided a sturdier evidentiary foundation for its decision to withhold the requested information, I would have readily agreed with my colleagues’ resolution of this appeal. On this record, though, I think we are compelled to reject the government’s invocation of Exemption 6. I would therefore affirm the district court’s decision.

. The Board of Visitors' reports are available at https://database.faca.gov/committee/ histories.aspx?cid=1860& fy=2002.

. The majority’s only response to this point is to speculate that "it is equally likely that escalating violence influenced the government’s decision to change its nondisclosure policy in 2005." Maj. op. at 646 n.20. The problem with this response is just that—it is predicated entirely on speculation. The majority cannot identify any evidence in the record of escalating violence that would justify the Defense Department’s withholding decision in 2005 because the Department submitted no such evidence. And because the government bears the burden of establishing a basis, for withholding under Exemption 6, that dearth of evidence is fatal to its claim. See Ray, 502 U.S. at 173, 112 S.Ct. 541.